892 A.2d 802

COMMONWEALTH of Pennsylvania, Appellee,

v.

Speer RUEY, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 14, 2005.

Decided March 6, 2006.

232

Ralph L.S. Montana, for Speer Ruey.

Jeffrey D. Burkett, Clarion, for Commonwealth of Pennsylvania.

CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, BAER, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice NEWMAN.

Speer Ruey (Appellant) appeals from an Order of the Superior Court reversing an Order of the Court of Common Pleas of Jefferson County (suppression court), which suppressed the introduction into evidence of medical records pertaining to his treatment at the University of Pittsburgh Medical Center (UPMC). For the reasons that follow, we affirm the Order of the Superior Court, albeit on different grounds, and remand the case for trial.

### FACTS AND PROCEDURAL HISTORY

Shortly before eight o'clock on the evening of March 26, 1999, Appellant was involved in a four-vehicle collision that resulted in one fatality as well as injuries to himself and at least three others. While driving a 1988 Nissan Pathfinder in the northbound lane of State Route 28 outside Brockway Borough in Jefferson County, Appellant crossed into the path of oncoming southbound traffic. His vehicle sideswiped two automobiles before colliding head-on with a 1989 Chevrolet

Cavalier owned and driven by Debra Seeley (Seeley). As a result of that collision, Seeley was seriously injured and Clarence Main, a passenger riding in her car, was killed. Appellant's Pathfinder flipped onto its roof, and he was seriously injured as well. Appellant and Seeley were evacuated by helicopter to UPMC.

Pennsylvania State Police Trooper Mark A. Bryan (Trooper Bryan) was the investigating officer at the scene of the accident. He determined, through the resting position of the vehicles and other accident reconstruction measures, that Appellant had caused the accident by crossing into the opposite lane of traffic. Trooper Bryan did not speak directly to Appellant or Seeley due to the emergent nature of their injuries, but he did interview the emergency medical services (E.M.S.) personnel at the scene. One E.M.S. person informed him that Appellant appeared to have been drunk, while another related that Appellant smelled of alcohol. Trooper Bryan inspected Appellant's Pathfinder, in which he found two bottles of wine, one of them empty and the other partially full, and near which he discovered a half-empty bottle of vodka.

Trooper Bryan called barracks personnel and asked that UPMC be contacted with a request to draw blood from Appellant. He later learned that UPMC emergency room staff, in response to the request, reported that "they were busy and they would do that [a blood-alcohol content (BAC) test] anyhow." (Notes of Testimony (N.T.), 9/24/01, at 17). Ultimately, UPMC did, in fact, perform a BAC test on Appellant.

On March 31, 1999, Trooper Bryan applied for a warrant to search for and seize "[a]ny and all [m]edical [r]ecords associated with the treatment of Speer RUEY, [address]. [D.O.B.] ... received on or after 03/26/99 at [UPMC]." (Reproduced Record (R.R.) at 25a). A district justice [1] issued the warrant

1. In 2004, the General Assembly redesignated "district justices" as "magisterial district judges," effective January 31, 2005. Act of 2004-207, Act of Nov. 30, 2004, P.L. 1618. Nevertheless, because the judge who issued the first warrant was, at the time, known as a district justice, we will use the old term when referring to her in this Opinion.

on April 3, 1999. On August 6, 1999, the Commonwealth charged Appellant with driving under the influence of alcohol (DUI),[2] homicide by vehicle while DUI,[3] aggravated assault by vehicle with DUI,[4] homicide by vehicle,[5] involuntary manslaughter,[6] aggravated assault,[7] simple assault,[8] and recklessly endangering another person.[9]

On May 2, 2000, Appellant filed a pretrial Motion to Suppress all evidence that the police seized pursuant to the authority of the search warrant that Trooper Bryan obtained on April 3, 1999. Appellant contended, *inter alia,* that the search warrant application lacked probable cause because Trooper Bryan failed to indicate in his Affidavit of Probable Cause (Bryan Affidavit) either that the information he received from the E.M.S. personnel was reliable or that he believed them to be credible witnesses.

On November 24, 2000, before the suppression court ruled on Appellant's Motion to Suppress, Pennsylvania State Police Trooper Keith Allen (Trooper Allen) applied for a second search warrant seeking the same medical records of Appellant from UPMC. In his Affidavit of Probable Cause (Allen Affidavit), Trooper Allen alleged that, during interviews he conducted in November of 2000, the E.M.S. personnel who had responded to the accident informed him that Appellant had smelled of alcohol, wept, asked about his dog, and used vulgar language. Trooper Allen further stated that Trooper Bryan told him that he had found three alcohol bottles, one near and two inside Appellant's Pathfinder. Trooper Allen also averred that Appellant was flown to UPMC for treatment and that he had probable cause to believe that UPMC medical records

2. 75 Pa.C.S. § 3731 (repealed 2003), *superseded by* 75 Pa.C.S. § 3802.
3. 75 Pa.C.S. § 3735 (amended 2003).
4. 75 Pa.C.S. § 3735.1 (amended 2003).
5. 75 Pa.C.S. § 3732 (amended 2000, 2002, 2003).
6. 18 Pa.C.S § 2504.
7. 18 Pa.C.S § 2702 (amended 2002, 2004).
8. 18 Pa.C.S. § 2701 (amended 2001, 2002).
9. 18 Pa.C.S. § 2705.

would indicate evidence of criminal activity on the part of Appellant. (N.T., Commonwealth Ex. No. 1 at 2–3). Subsequent to the application of Trooper Allen, a second search warrant ultimately was issued. By Order entered November 29, 2000, the suppression court formally declared the first warrant invalid.

On January 22, 2001, the Commonwealth filed a Brief in Opposition to [Appellant's] Motion to Suppress, asserting the validity of the second search warrant, which, it argued, cured the defects of the first warrant. The Commonwealth relied principally on the independent source doctrine, which operates as an exception to the exclusionary rule so as to permit the introduction at trial of evidence seized during an illegal search if the prosecution can demonstrate that the allegedly tainted evidence ultimately would have been procured through means independent of the illegality. *See, e.g., Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226, 230 (1996); *Commonwealth v. Yvonne Mason,* 535 Pa. 560, 637 A.2d 251, 254 (1993).

The suppression court held a hearing on September 24, 2001, to determine the admissibility of the medical records pursuant to the second warrant. At the hearing, Trooper Bryan testified that Trooper Allen was present at the accident site and that "[p]rimarily, he assisted at the scene, and eventually he helped with the reconstruction to take measurements." (N.T. at 19). Trooper Bryan further testified that "[s]everal times [Trooper Allen] conferred with me for information he needed for the new search warrant, and just other preliminary stuff." (*Id.* at 20). According to his testimony, Trooper Bryan provided Trooper Allen with a full and complete copy of his original investigatory file.

Trooper Allen testified that he went to the accident scene initially to deliver supplies but that, once there, he spoke with another on-scene officer to learn what had happened. Trooper Allen did not conduct interviews at this time and only assisted with accident reconstruction. Subsequently, a prosecutor asked him to prepare a new search warrant. According to his testimony, in preparing the application, Trooper Allen:

spoke with Trooper Bryan; glanced through the report and went over the investigation ...; [] drafted up a preliminary copy of the affidavit and the search warrant, which was reviewed by [the prosecutor]. [Trooper Allen then] reviewed it for spelling corrections and other additional requirements that needed to be fixed in the warrant.

(*Id.* at 24). Trooper Allen also re-interviewed E.M.S. personnel that Trooper Bryan had questioned and another individual whom Trooper Allen had identified from the report of Trooper Bryan. Trooper Allen further testified that "[e]verything [he] learned after talking to the people was the same" concerning what Trooper Bryan had learned and that he "looked at what Trooper Bryan did and looked to make sure it was correct." (*Id.* at 33). The Allen Affidavit contained "the re-interviews ... plus what [the witnesses] said at the preliminary investigation." (*Id.* at 32–33).

Following the hearing, by Order entered November 14, 2001, the suppression court granted Appellant's Motion to Suppress the medical records that the police obtained from UPMC notwithstanding the issuance of the second warrant. After finding that the Commonwealth had obtained the medical records "pursuant to a warrant that was later deemed invalid" (suppression ct. Op. at 1 (unnumbered)), the suppression court assumed without explanation that the exclusionary rule barred the introduction of those records into evidence. The suppression court then concluded that the independent source exception to the exclusionary rule was inapplicable based on its determination that "the actions of Trooper Allen in concurring with [Trooper Bryan] and essentially re-enacting his investigation [were] not an independent alternative source from which the evidence could have been obtained." (*Id.* at 5).

The Commonwealth timely appealed, and the matter originally came before a three-judge panel of the Superior Court. On February 11, 2003, the panel filed a Memorandum Opinion affirming the Order of the suppression court with Judge Cavanaugh dissenting. On April 17, 2003, the Superior Court granted the Commonwealth's Application for Reargument *en*

*Banc.* The Superior Court sitting *en banc* issued a published Opinion dated July 8, 2004, reversing the Order of, and remanding the case to, the suppression court. *Commonwealth v. Ruey,* 854 A.2d 560 (Pa.Super.2004) (*en banc*).

Although the Superior Court noted that "the dispositive flaw in [the Bryan Affidavit] was technical in nature," *id.* at 566, it followed the example set by the suppression court by summarily concluding that, unless an exception applied, the exclusionary rule precluded the introduction into evidence of the medical records of Appellant. Unlike the suppression court, however, the Superior Court determined that the independent source exception was applicable and thus served as the basis for the introduction into evidence of the medical records of Appellant. Notwithstanding Trooper Allen's reliance on the investigatory file prepared by Trooper Bryan and his materially identical findings, the Superior Court deemed the second investigation, conducted by Trooper Allen, to be sufficiently separate from the initial one for the purposes of the independent source exception. "Where the principal taint on the original investigation is a technical error in the drafting of an affidavit of probable cause," the Superior Court held, "another officer must remain free to review and assess the facts independently and seek a new warrant, notwithstanding some connection to the original investigating officer." *Id.* at 570. In terms of the instant case, "[c]ause to search [Appellant]'s medical records . . . would have been found had [Trooper] Bryan's warrant application not been tainted by omission, which is sufficient to warrant application of the independent source doctrine." *Id.* at 571.

Judges Joyce and Stevens filed dissenting opinions in which they each expressed the view that the Commonwealth failed to carry its burden of proving the applicability of the independent source exception. Appellant timely appealed the Superior Court's reversal of the Order of the suppression court, and, on February 28, 2005, we granted allowance of appeal.

## DISCUSSION

Our standard of review of the suppression ruling of a trial court is well established. "[W]here a motion to suppress

has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible." *Commonwealth v. DeWitt*, 530 Pa. 299, 608 A.2d 1030, 1031 (1992). Where, as in the instant case, there is no meaningful dispute of fact, our duty is to determine whether the suppression court properly applied the law to the facts of the case. The conclusions of law of the suppression court are not binding on this Court. *Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 881 (1998).

On appeal, the Commonwealth argues that the second warrant application, which Trooper Allen prepared, saves Appellant's BAC test results from suppression. Appellant, however, contends that, because Trooper Allen simply re-enacted the investigation of Trooper Bryan, the Superior Court erred in finding the independent source exception applicable because, according to Appellant, that doctrine "was not established to provide for multiple attempts of the same investigation to obtain evidence legally." (Brief of Appellant at 17).

Instead of focusing on the precise nature of the violation in order to determine whether the exclusionary rule barred the introduction into evidence of the medical records, the Superior Court began by considering the applicability of the independent source exception to the exclusionary rule. A more proper analysis, however, asks whether suppression is an appropriate remedy for the flaw in the Bryan Affidavit in the first place, because, if not, there would be no need for independent source analysis.

 Article I, Section 8 of the Pennsylvania Constitution provides as follows:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.[10]

10. The Fourth Amendment to the United States Constitution similarly protects against unreasonable searches and seizures. For reasons that

The protection provided by Article I, Section 8 "extends to areas where an individual has a reasonable expectation of privacy." *Commonwealth v. Shaw*, 564 Pa. 617, 770 A.2d 295, 299 (2001). Generally, the medical records of a patient are one such area. *Id.; see also Commonwealth v. Kohl*, 532 Pa. 152, 615 A.2d 308, 315 (1992) ("The administration of a blood test is a search within the meaning of Article I, Section 8 if performed by an agent of, or at the direction of[,] the government.").

■■■■ Pursuant to the so-called exclusionary rule, "[e]vidence discovered **as a result of** a search that violates **the fundamental constitutional guarantees of** Article I, Section 8 will be suppressed." *Commonwealth v. Gordon*, 546 Pa. 65, 683 A.2d 253, 256 (1996) (emphasis added). Thus, it is important to distinguish between a violation of the fundamental constitutional guarantees of Article I, Section 8 and mere technical noncompliance with the Pennsylvania Rules of Criminal Procedure. We have, in fact, specifically "reject[ed] the automatic application of the exclusionary rule to suppress evidence seized pursuant to a search which in some way violates the Pennsylvania Rules of Criminal Procedure relating to the issuance and execution of search warrants." *Commonwealth v. Gerald Mason*, 507 Pa. 396, 490 A.2d 421, 423 (1985). Indeed, it is only when violations of the Rules "assume constitutional dimensions and/or substantially prejudice the accused" that suppression may be necessary. *Id.* at 425.

In the case before us, the Commonwealth has admitted that the application for the first warrant was "faulty" given, *inter alia*, the absence in the Bryan Affidavit of an indication that the E.M.S. personnel who responded to the accident were credible or that the information they provided was reliable. (Brief of Commonwealth at 18). In light of the concession of the Commonwealth that the first warrant was technically invalid, the suppression court issued an Order formally declaring the invalidity of that warrant. Nevertheless, the Commonwealth has consistently maintained that "abundant" prob-

will become clear later in our Discussion, however, we confine our analysis to Article I, Section 8 of the Pennsylvania Constitution.

able cause supported the issuance of the first warrant. (*See, e.g.*, Brief in Opposition to [Appellant]'s Omnibus Pretrial Motion at 2 (unnumbered); *Commonwealth v. Ruey*, 854 A.2d 560, 563 (Pa.Super.2004) (*en banc*) (quoting the *En Banc* Brief of the Commonwealth at 4); Brief of Commonwealth at 18). Therefore, although the issue of the technical validity of the first warrant is waived pursuant to Pennsylvania Rule of Appellate Procedure 302(a), the question as to whether probable cause supported that warrant is still, and has always been, in dispute. This Court may thus proceed to consider that question.

In its entirety, the Affidavit of Probable Cause of Trooper Bryan stated as follows:

PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:

On 03/26/99 at approximately 1953 hours, the affiant was detailed to investigate a motor vehicle accident which occurred on Sr28, Snyder Twp., Jefferson County. Refer Incident Report C4–0596837.

Through investigation it was determined that a 1988 Nissan Pathfinder bearing PA Registration ... owned and operated by Speer RUEY, [address], while traveling north bound, crossed the center line of SR28. The vehicle then struck a 1986 Dodge pickup truck bearing PA Registration ... owned and operated by Roger BERKLEY, [address]. The north bound vehicle operated by RUEY continued traveling north and then struck a 1995 Chevrolet bearing PA Registration ... which was traveling south bound. The south bound Chevrolet was owned and operated by James RONEY, [address]. The north bound vehicle operated by RUEY continued traveling north on Sr28 and collided with a 1989 Chevrolet bearing PA Registration.... This vehicle was owned and operated by Debra SEELEY, [address]. The collision of the north bound unit operated by RUEY and the south bound unit operated by SEELEY was head-on and occurred in the south bound lane of Sr28.

As a result of the above collisions, injuries were received by Speer RUEY, James RONEY and Debra SEELEY. Also, Clarence MAIN, [address], a passenger in the vehicle operated by Debra SEELEY, died as the result of multiple blunt force trauma injuries received as a result of this accident.

First responding E.M.S. person, Paul VERNE, [address] informed that upon arriving at the scene and observing the Nissan Pathfinder, which had rolled over onto its roof, a male (RUEY) was laying with his head coming out of the drivers [sic] side front side window. No one else was observed inside or around the Nissan Pathfinder.

Donald MOORE, [address] responding E.M.S. person at the accident[,] informed that upon observing the Nissan Pathfinder, RUEY was laying face up with his head outside of the drivers [sic] side window. No one else was in the vehicle or around it. RUEY also informed MOORE[:] "I was going to camp. I was going fishing."

Kenneth ALLSHOUSE, [address], an E.M.S. paramedic responding to the scene[,] informed that while treating Speer RUEY at the scene of the accident, he noticed an odor of alcholic [sic] beverage on and about RUEY.

While at the scene of the accident and inspecting the area immediately surrounding the Nissan Pathfinder, the affiant observed an empty bottle of Sutter Home 1997 Chardonnay wine. Also observed inside the Nissan Pathfinder was a partially full bottle of Smirnoff Citrus Twist Vodka and a partially full bottle of Carlo Rossi Paisano wine. These items were collected and entered into evidence.

Your affiant has been a member of the Pennsylvania State Police for 13 years. I have received training in the investigation of motor vehicle accidents and have investigated numerous such accidents. It is the affiants [sic] belief that through obtaining the above listed medical records of Speer RUEY, leads may be developed that will assist in the completion of this investigation.

/s/

Tpr. Mark A. BRYAN

(R.R. at 26a–27a).

█ As the Commonwealth concedes, there is indeed no express indication in the Bryan Affidavit to the effect that Trooper Bryan either: (1) found the E.M.S. personnel to be credible; or (2) considered the information they gave him to be reliable. Furthermore, the Bryan Affidavit lacks any mention of the foundation of Trooper Bryan's belief that UPMC had conducted a BAC test on Appellant or even that Appellant had been transported there for treatment. Whether these defects rise to the level of a violation of the fundamental guarantees of Article I, Section 8 is a question that requires our determination.

█ To ensure that the citizens of the Commonwealth are protected from unreasonable searches and seizures, Article I, Section 8 requires that a warrant: (1) describe the place to be searched and the items to be seized with specificity; and (2) be supported by probable cause to believe that the items sought will provide evidence of a crime. *Commonwealth v. Waltson*, 555 Pa. 223, 724 A.2d 289, 292 (1998). As the Commonwealth acknowledges in its Brief before this Court, the Bryan Affidavit failed to specify that Appellant had been taken to UPMC after the accident or that he had been treated there for his injuries. (Brief of Commonwealth at 4 n. 1). Nevertheless, although the Affidavit itself does not contain this information, the search warrant application did specify UPMC as the place to be searched and the medical records associated with Appellant's treatment there as the items to be seized.

The above-quoted Affidavit of Probable Cause to which Trooper Bryan swore constitutes the second and third pages of the original warrant application, which he prepared. Immediately preceding the Affidavit in the application is a cover page, which prompts the affiant to, *inter alia*, "IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED." (R.R. at 25a). In the blank box beneath this prompt, Trooper Bryan filled in the following: "Any and all Medical Records associat-

ed with the treatment of Speer RUEY, [address]. [D.O.B.]. Request records for all treatment received on or after 03/26/99 at below facility." The next item on the application cover page requested a "SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED." Underneath this heading, Trooper Bryan listed the following address:

University of Pittsburgh Medical Center

200 Lothrop St.,

Pittsburgh, PA 15213

ATTN: Medical Records Department

Therefore, although Trooper Bryan failed to attest in his Affidavit that Appellant was taken to UPMC or treated there for his injuries, the search warrant application clearly specified the place to be searched and the items to be seized, as Article I, Section 8 of the Pennsylvania Constitution requires.

As for the probable cause requirement of Article I, Section 8, following his investigation at the accident scene, Trooper Bryan determined that a Nissan Pathfinder, owned and operated by Appellant, crossed the centerline of State Route 28. Upon closer inspection of the Pathfinder, Trooper Bryan noticed a half-empty bottle of wine and a partially full bottle of vodka inside the vehicle, and an empty wine bottle on the ground nearby. The inclusion in the Bryan Affidavit of these first-hand observations clearly provided sufficient probable cause for the issuance of the first warrant. Hence, it is irrelevant to the question of probable cause that the Bryan Affidavit failed to indicate that the information that Trooper Bryan received from the E.M.S. personnel was reliable or that he believed them to be credible witnesses. Abundant facts and circumstances existed beyond that information to support probable cause for Trooper Bryan to suspect Appellant of driving, and causing the accident, while under the influence of alcohol, and Trooper Bryan did not fail to include those facts and circumstances in the Bryan Affidavit.

Substantively speaking, then, the application for the original search warrant was supported by probable cause and specified the place to be searched and the items to be seized, as

required by Article I, Section 8. We must now consider whether any procedural violation on the part of Trooper Bryan in applying for that warrant was so significant as to deprive Appellant of the fundamental guarantees of that Section.

Pennsylvania Rule of Criminal Procedure 206 provides, in relevant part:

> Each application for a search warrant shall be supported by written affidavit(s) signed and sworn to or affirmed before an issuing authority, which affidavit(s) shall[, *inter alia* ]:
>
> . . .
>
> (5) specify or describe the crime which has been or is being committed;
>
> (6) set forth specifically, the facts and circumstances which form the basis for the affiant's conclusion that there is probable cause to believe that the items or property identified are evidence or the fruit of a crime, or are contraband, or are otherwise unlawfully possessed or subject to seizure, and that these items or property are located on the particular person or at the particular place described;
>
> . . . .

Pa.R.Crim.P. 206(5–6). Arguably, by omitting any reference to the credibility of the E.M.S. personnel or the reliability of the information they provided, Trooper Bryan failed, pursuant to Rule 206(5–6), to specify sufficiently the facts and circumstances that formed the basis for his conclusion that there was probable cause for him to believe that the medical records would provide evidence of a crime. In addition, by neglecting to attest in the Affidavit itself that Appellant had been transported to, or treated at, UPMC, Trooper Bryan failed to explain "the basis for [his] conclusion that there [wa]s probable cause to believe that the items . . . identified . . . [we]re

located ... at the particular place described." Pa.R.Crim.P. 206(6).

The Pennsylvania requirement that an affiant indicate the credibility of his sources or at least the reliability of the information that he gathered from them derives from two decisions of the United States Supreme Court: (1) *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); and (2) *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).[11] *See Commonwealth v. Sudler,* 496 Pa. 295, 436 A.2d 1376, 1380 (1981). In *Commonwealth v. Conner,* 452 Pa. 333, 305 A.2d 341 (1973), we quoted the following language from *Aguilar:*

> Although an affidavit may be based on hearsay informa-
> tion and need not reflect the direct personal observations
> of the affiant, the magistrate must be informed of some of
> the underlying circumstances from which the informant
> concluded that the narcotics were where he claimed they
> were, and some of the underlying circumstances from
> which the officer concluded that the informant, whose
> identity need not be disclosed, was "credible" or his
> information "reliable."

*Id.* at 343 (internal citations and quotation marks omitted); *accord Commonwealth v. Bailey,* 460 Pa. 498, 333 A.2d 883, 886 (1975) (similarly relying on *Aguilar* without mentioning Article I, Section 8); *see also Commonwealth v. Bedford,* 451 Pa. 325, 304 A.2d 453, 454 (1973); *Commonwealth v. Hall,* 451 Pa. 201, 302 A.2d 342, 343 (1973); *Commonwealth v. Milliken,* 450 Pa. 310, 300 A.2d 78, 81–82 (1973). Occasionally, this requirement has been reflected in other federal decisions or even in our own Rules of Criminal Procedure. *See, e.g., Commonwealth v. Chandler,* 505 Pa. 113, 477 A.2d 851, 856 (1984) (citing *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and Rule 2003(a)). Article I, Section 8 of the Pennsylvania Constitution, however, remained conspicu-ously absent from such discussions. In fact, in *Common-wealth v. Gray,* 509 Pa. 476, 503 A.2d 921 (1985), when we

11. As explained below, both decisions were ultimately abrogated by *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

explicitly replaced the *Aguilar-Spinelli* approach with a more relaxed standard that the U.S. Supreme Court had established in its place,[12] we expressly rejected the notion that Article I, Section 8 in any way compelled us to continue to follow *Aguilar-Spinelli*. *Id.* at 926 (finding "no substantial textual difference" between the Fourth Amendment and Article I, Section 8 that would justify maintaining a more stringent standard in Pennsylvania). Of course, it would have been well within our prerogative to do so, as this Court has occasionally seen fit to establish more exacting requirements, for state constitutional reasons, with respect to searches, seizures, and probable cause than the Fourth Amendment would obligate us to impose. *See, e.g., Commonwealth v. Kohl,* 532 Pa. 152, 615 A.2d 308, 314 (1992) ("[Article I, Section 8] has an identity and vitality that is separate and distinct from that of the Fourth Amendment."); *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 899 (1991) (distinguishing Article I, Section 8 from the Fourth Amendment in terms of the additional purpose of the former in safeguarding privacy, as distinct from the single-mindedness of the latter, which was premised only on deterrence grounds).

Indeed, our decision today is by no means meant to undermine the seminal opinion of this Court in *Commonwealth v. Edmunds,* in which we expressly declined to adopt a "good faith" exception to the exclusionary rule. In *Edmunds,* after a thorough review of the unique history and relevance of Article I, Section 8, as distinct from the Fourth Amendment, we concluded that:

> given the strong right of privacy which inheres in Article I, Section 8, as well as the clear prohibition against the issuance of warrants without probable cause, or based upon defective warrants, the good faith exception to the exclusionary rule would directly clash with those rights of citizens as developed in our Commonwealth over the past 200 years. . . . From the perspective of the citizens whose

12. As more fully explained *infra,* in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court established this more lenient standard, thereby abrogating *Aguilar* and *Spinelli.*

rights are at stake, an invasion of privacy, in good faith or bad, is equally as intrusive.

*Edmunds,* 586 A.2d at 901. These words are no less true today. *See, e.g., Commonwealth v. Torres,* 564 Pa. 86, 764 A.2d 532, 540 (2001) (citing *Edmunds* in declaring that "there is no 'good faith exception' to the exclusionary rule in the Commonwealth of Pennsylvania"); *Commonwealth v. Price,* 543 Pa. 403, 672 A.2d 280, 284 (1996) ("[W]here the unlawful actions of the individual are deemed to be state action, the exclusionary rule applies and any evidence obtained as a result of those actions must be suppressed. The good or bad faith of the individual acting under color of state authority is simply irrelevant.").

Even so, in *Edmunds* itself, "[w]e reaffirm[ed] the principle of [*Gerald*] *Mason* that not all technical violations of the Rules of Criminal Procedure—standing alone—automatically require exclusion of evidence." *Edmunds,* 586 A.2d at 903 n. 14. Only with respect to those violations, "the end result [of which] is a lack of probable cause or some other fundamental defect in the warrant," might suppression be appropriate. *Id.*

█ We thus return to the question that *Gerald Mason* requires us to ask, namely, whether the defects of the first warrant "assume[d] constitutional dimensions and/or substantially prejudice[d] [Appellant]" such that suppression may be necessary. *Commonwealth v. Gerald Mason,* 507 Pa. 396, 490 A.2d 421, 425 (1985). In its most tangible terms, the fundamental constitutional guarantee at issue here is that the determination of probable cause to issue the search warrant be made before, not after, the search. As counsel for Appellant conceded at argument, the Allen Affidavit contained no new information of significance when read in conjunction with the Bryan Affidavit. (*See also* Brief of Appellant at 7 ("[Trooper Allen] learned of no new evidence or statements and he copied directly from Trooper Bryan's report when he applied for the second search warrant."). The Allen Affidavit contained the information that Trooper Allen gathered from interviewing the same witnesses as Trooper Bryan, at times providing slightly more detail. For example, Trooper Allen

alleged that: (1) E.M.S. person Paul Verne told him that Appellant "seemed more concerned about his dog than anything else;" and (2) he learned from E.M.S. person Donald Moore that, while being loaded onto the helicopter, Appellant "called E.M.S. personnel 'Sons of Bitches' or 'Bastards[,]' then told them they were 'good guys' and that he 'loved them.' " (N.T., Commonwealth Ex. No. 1 at 2). In addition, the Allen Affidavit indicated that Appellant was flown by helicopter to UPMC for treatment of his injuries (*id.* at 2) and explained his probable cause to believe that the medical records would contain evidence of criminal activity on the part of Appellant:

> It has been my experience that hospital personnel, in rendering treatment to patients injured in motor vehicle accidents, draw blood from the patient and use the blood sample to determine the (BAC) Blood Alcohol Content. It has also been my experience that medical personnel take note of a person's demeanor, behavior and dialog at the time that they render treatment. These are often documented on medical records at the time of treatment. There is probable cause to believe that evidence of criminal activity will be found in said records because as noted above, [Appellant] was acting strangely at the accident scene, making strange statements and his breath had the odor of alcoholic beverages. It is probable that he exhibited the same mannerisms at the hospital, all of which, in your Affiant's experience and training are evidence or signs of him being under the influence of alcohol.

(*Id.* at 3).

It is difficult to imagine in what sense Appellant could have been even slightly prejudiced, let alone substantially so, because of the technical violations that occurred here. Certainly, the BAC test results were no more incriminatory in November of 2000, when Trooper Allen obtained the second warrant, than they were in March of 1999, when Trooper Bryan applied for the first warrant. If, upon applying for the second search warrant, Trooper Allen had any knowledge of the results of the BAC test that medical personnel at UPMC had conducted on Appellant, the Allen Affidavit made abso-

lutely no mention of the fact.[13] Therefore, because the defects in the first warrant neither assumed constitutional dimensions nor resulted in substantial prejudice to Appellant, we hold that the suppression court erred in granting Appellant's Motion to Suppress the introduction into evidence of his medical records.

 In holding that the defects in Trooper Bryan's warrant were of the technical nature that *Gerald Mason* deems insufficient to warrant suppression, we remain cognizant, even if the Commonwealth is not, of the test with which we replaced the *Aguilar-Spinelli* approach to analyzing warrants:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921, 925 (1985) (quoting *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)) (alterations and internal quotation marks omitted). "A corollary of the 'totality of the circumstances' test is that the affidavit should be interpreted in a

13. Unlike the trial court, we do not deem irrelevant the fact that "Officer Bryan clearly believed he was acting under the authority of a proper warrant, which he had in hand before seeking [Appellant]'s medical records." *Commonwealth v. Ruey,* 854 A.2d 560, 568 (Pa.Super.2004) (*en banc*). Notwithstanding our continued refusal to adopt a "good faith exception" to the exclusionary rule, we emphasize nonetheless that this is not a case of a seizure "in reliance on the conjecture or assumption that a search warrant would issue at a later time," *id.,* as was the case in *Melendez* and *Yvonne Mason,* both of which Appellant cites. We agree with the Commonwealth that it was "this very specific kind of evil" that the holdings of this Court in *Melendez* and *Yvonne Mason* were designed to prevent. (Brief of Commonwealth at 17); *see Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226 (1996) (forcible entry of house while application for a search warrant was still being prepared); *Commonwealth v. Yvonne Mason,* 535 Pa. 560, 637 A.2d 251 (1993) (forcible entry of apartment via battering ram while awaiting warrant).

common sense and realistic fashion." *Commonwealth v. Baker*, 513 Pa. 23, 518 A.2d 802, 804 (1986).

We take the opportunity that the instant case presents to accord legal significance to the common-sense distinction between the absence of probable cause and the mere lack of a full and complete articulation of the same. The failure of Trooper Bryan to comply fully with the requirements of Pennsylvania Rule of Criminal Procedure 206 in no way negated the fact that the district justice who issued the first warrant had a substantial basis for concluding that probable cause existed to suspect Appellant of having committed the various DUI-related offenses with which he was ultimately charged. However procedurally imperfect the Bryan Affidavit may have been, there is simply no reason why the district justice should not be permitted to draw the substantive conclusion that the facts and circumstances included in that Affidavit so strongly compelled.

Similarly, with respect to the failure of Trooper Bryan to attest in his Affidavit that Appellant had been taken to UPMC after the accident or that he had been treated there for his injuries, the district justice could reasonably have inferred the specific place to be searched and items to be seized from the face of the application for the original warrant. The last line of the Bryan Affidavit read as follows: "It is the affiants [sic] belief that through obtaining the above listed medical records of Speer RUEY, leads may be developed that will assist in the completion of this investigation." (R.R. at 27a). The common sense of the district justice would have alerted her to the obvious fact that "the above listed medical records" referred to the front page of the application, which specified that the UPMC Medical Records Department was the place to be searched and that records documenting Appellant's treatment at UPMC on or after March 26, 1999, were the items to be seized. Therefore, although Pennsylvania Rule of Criminal Procedure 206(6) does require specification of place and items within the affidavit of probable cause itself, their absence in the Bryan Affidavit did not amount to an unconstitutional deprivation of Appellant's freedom from unreasonable

searches and seizures. *See also Commonwealth v. Waltson,* 555 Pa. 223, 724 A.2d 289, 292 (1998) (requiring merely that the place to be searched "be described precise[ly] enough to enable the executing officer to ascertain and identify, with reasonable effort, the place intended") (internal quotation marks omitted).

As we have noted more recently, "[p]robable cause is a 'practical, nontechnical conception:' it 'is a fluid concept—turning on the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules.'" *Commonwealth v. Glass,* 562 Pa. 187, 754 A.2d 655, 663 (2000) (quoting *Gates,* 462 U.S. at 231–32, 103 S.Ct. 2317). Indeed, the instant case illustrates as clearly as any other the very reason we adopted this approach, namely, the need to be mindful of "the notion of probable cause as based on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gray,* 503 A.2d at 925 (quoting *Gates,* 462 U.S. at 231, 103 S.Ct. 2317) (internal quotation marks omitted).

### CONCLUSION

The Superior Court correctly determined that the Commonwealth demonstrated that Appellant's BAC test results were admissible at trial and properly reversed the Order of the suppression court.

The Order of the Superior Court is therefore AFFIRMED, albeit on different grounds, and the case is REMANDED for trial.

Justice BAER joins the opinion.

Former Justice NIGRO did not participate in the decision of this case.

Justice CASTILLE files a concurring opinion in which Justice SAYLOR and EAKIN join.

Justice SAYLOR files a concurring opinion in which Justice CASTILLE joins.

Chief Justice CAPPY files a dissenting opinion.

Justice CASTILLE, Concurring.

I join Mr. Justice Saylor's Concurring Opinion.[1] I write separately only to address the Lead Opinion's apparent approval of the notion that warrant affidavits must include specific averments indicating the basis for crediting information provided by third party sources, such as the emergency medical technicians at the scene in the case *sub judice*, before the information from those sources can be considered in the assessment of probable cause. The Lead Opinion notes that the supposed defect in the first warrant affidavit consisted in the fact that Trooper Bryan failed to include any information proving the reliability or credibility of the E.M.S. personnel who responded to the accident scene and described to the Trooper what they had seen. *See* Opinion Announcing the Judgement of the Court (OAJC) slip op. at 4, 10, 12. At one point, the Lead Opinion suggests that such information "arguably" is required under Pennsylvania law and/or under the Rules of Criminal Procedure. *Id.* at 13–15. I do not believe that such averments are required where, as here, identified citizens are the source of the challenged information.

The E.M.S. personnel who responded to the scene of the accident in this case were all identified by name in the warrant affidavit, and the factual information each provided to police was individually and specifically set forth. This fact, in my view, clearly removes this case from any residual *Aguilar/Spinelli*[2] need to offer independent proof of reliability and/or credibility. I have written in the past that, when considering the sufficiency of a warrant affidavit, it is important to distin-

1. I believe the question of whether the averments made to the district justice (either written in the affidavit or through oral representations) were sufficient to establish a belief, be it through common sense or otherwise, that evidence of a crime would likely be found at UPMC is extremely close. Ultimately, and particularly given the Commonwealth's concession of this point, I am persuaded by Mr. Justice Saylor's view; it appears there was a "missing link" in the affidavit on this point.

2. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637

guish between citizen witnesses who provide information to police on one hand, and confidential informants or anonymous sources on the other hand. I noted that the reasons to question the reliability of the latter sources do not apply in the case of citizen witnesses:

> At the other end of the reliability continuum, this Court has acknowledged that the citizen witness who reports a crime is *presumptively* trustworthy. *Commonwealth v. Weidenmoyer*, 518 Pa. 2, 9–10, 539 A.2d 1291, 1295 (1988). This is so because a citizen informer:
>
>> [A]cts with an intent to aid the police in law enforcement because of his concern for society or for his own personal safety. He does not expect any gain or concession in exchange for his information. An informer of this type usually would not have more than one opportunity to supply information to the police, thereby precluding proof of his reliability by pointing to previous accurate information which he has supplied.
>
> *Id.* at 10, 539 A.2d at 1295 (citations omitted). Thus, "when an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case." *Commonwealth v. Sudler*, 496 Pa. 295, 305, 436 A.2d 1376, 1381 (1981) (*quoting* W. LaFave, Search and Seizure § 3.4(a) at 592 (1978)).

*Commonwealth v. Torres*, 564 Pa. 86, 764 A.2d 532, 546–47 (2001) (Castille, J., concurring and dissenting) (emphasis original). Thus, in my view, the issuing authority in this case, who was charged with viewing the affidavit in a common sense

(1969). The *Aguilar/Spinelli* approach required that a warrant "pass two specific tests, under which the issuing authority had to be able to see, on the face of the affidavit of probable cause, both the informant's basis for his knowledge and independent facts showing the reliability of the informant." *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921, 924 (1985). The United States Supreme Court replaced the *Aguilar/Spinelli* test with a totality of the circumstances test in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). This Court adopted the *Gates* test for probable cause as a matter of state constitutional law in *Gray*.

fashion, could properly assume the reliability of the information provided by the E.M.S. personnel. To the extent the Lead Opinion suggests that more is required, either by Article I § 8 of the Pennsylvania Constitution or by Pa.R.Crim.P. 206, I respectfully disagree.[3]

Justice SAYLOR and EAKIN join this opinion.

Justice SAYLOR, Concurring.

I respectfully differ with the lead Justices' conclusion that the warrant first obtained by police to secure Appellant's medical records comported with Fourth Amendment requirements. The Fourth Amendment requires that the government establish a nexus among the four factors of time, crime, objects, and place. *See generally* 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.7(d) (4th ed.2004). In the present case, the Commonwealth acknowledges as a "glaring flaw" in the first affidavit of probable cause the affiant officer's failure to attest that Appellant was ever transported to, or treated at, the University of Pittsburgh Medical Center, Brief for Appellee at 4 n. 1, thus, facially omitting the essential connection to place.[1] I therefore believe that it is necessary to address the arguments on the terms presented by the parties.

---

3. I also respectfully distance myself from the Lead Opinion's *dicta* concerning *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). OAJC slip op. at 15–16. There is no issue presented concerning the *Edmunds* Court's rejection of the good faith exception.

1. In its probable cause evaluation, the lead opinion amply develops the various circumstances that support the conclusion that UPMC was identified to the district justice as the place to be searched. *See* Opinion Announcing the Judgment of the Court, *slip op.* at 12–13; *cf. id.* at 21 (reflecting similar observations relative to compliance with Pa.R.Crim.P. No. 206(6)). What is lacking, however, is an assessment concerning whether specific facts or circumstances were communicated to the district justice from which she reasonably could infer that evidence of a crime could be found at UPMC. In this regard, the record does not reflect that any facts were presented to the district justice to establish such connection, since there is no evidence that the affiant officer communicated that Appellant had been taken to UPMC after the fatal accident.

While certainly it may be argued that, as a matter of common sense, the officer would not select a hospital that he did not believe would possess records deriving from Appellant's contemporaneous treatment, such analysis transcends the permissible boundaries of the probable cause

In this regard, I agree with the Commonwealth's argument that the concerns present in seminal decisions of this Court that have tightened the independent source exception to the exclusionary rule, such as unjustified and/or forcible entry into a residence, *see, e.g., Commonwealth v. Melendez,* 544 Pa. 323, 333–34, 676 A.2d 226, 231 (1996); *Commonwealth v. Mason,* 535 Pa. 560, 571, 637 A.2d 251, 257 (1993), simply are not present here. Additionally, as the Commonwealth emphasizes, the evidence at issue (hospital records) is not evanescent, as was also the case in the decisions in which the "time" nexus factor has assumed particular importance. Moreover, the "independent investigative team" requirement that has arisen as a specific restriction on recourse to the independent source doctrine in Pennsylvania, focuses on foreclosing any advantage to the government arising from police misconduct and/or tainted evidence. *See Melendez,* 544 Pa. at 334, 676 A.2d at 231 ("[A]pplication of the 'independent source doctrine' is proper only in the very limited circumstances where the 'independent source' is *truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered.*" (quoting *Mason,* 535 Pa. at 573, 637 A.2d at 257–58 (emphasis in original))). Here, as the lead Justices observe, inadvertence rather than police misconduct is involved, and the police had ample grounds to believe that Appellant's medical records reposited at the University of Pittsburgh Medical Center contained incriminating evidence, without any

inquiry in connection with the authorization of a search warrant. The object of the warrant requirement is to assure that sufficient facts and circumstances are put before the magistrate to permit her to make an independent judgment concerning the likelihood that evidence of a crime is present (or illegal activity is occurring) at the place to be searched. *See Commonwealth v. Edmunds,* 526 Pa. 374, 409, 586 A.2d 887, 905 (1991). Thus, permissible inferences in this context are to be drawn from the facts and circumstances put before the magistrate, and not from assumptions concerning the affiant's motivations and/or good faith. *See id.*

Accordingly, I agree with the position of both parties to this appeal that the submission to the district justice was insufficient to establish the necessary probable cause to believe that evidence of a crime was located at UPMC.

resort to the records obtained pursuant to the defective affidavit and warrant.[2]

In such circumstances, the Commonwealth argues, persuasively, that neither the Fourth Amendment nor Article I, Section 8 should be read as forever foreclosing it from access to records that are maintained by a treatment provider and that are otherwise preserved in the ordinary course of the provider's business. Instead, the Commonwealth advocates applying the independent source exception to the exclusionary rule to permit the issuance of a second warrant, subject to the following constraints:

> [W]hen a search warrant is issued based upon a faulty application and when: 1) the officer had abundant probable cause to make his warrant request, 2) the officer did not act in bad faith in any way in obtaining the warrant and underlying evidence, 3) the evidence to be sought by a second valid warrant is not evanescent, but rather, is extant and permanent, and 4) probable cause continues to exist to believe the evidence will be found in the place to be searched, then the Commonwealth should not be precluded from obtaining that evidence by obtaining a new search warrant in which the flaws of the initial application have been corrected.

Brief for Appellee at 18–19.[3]

This frame of reference obviously is not material under federal constitutional law, since the exclusionary rule as ap-

---

**2.** Appellant's position appears to be that, by virtue of the deficiencies in the initial warrant, all of the legitimate evidence supporting probable cause (for example, the evidence of Appellant having crossed the center line into an opposing lane of traffic; the arresting officer's observation of liquor and wine bottles in and around Appellant's vehicle; and the officer's interviews with emergency medical personnel who conveyed their observations concerning Appellant's unusual conduct, his inebriated appearance, and the smell of alcohol arising from his presence) must be viewed as tainted. I would reject this position, however, as I believe that the taint referenced in the cases narrowing the independent source doctrine refers to evidence that has been obtained by unlawful or unjustified police conduct, and none of the above evidence was so garnered.

**3.** While certainly this analysis contains a good faith component as an additional limiting factor and safeguard, I do not regard it as in conflict

plied at the federal level is subject to a generalized good faith exception. I believe that it is both necessary and appropriate in Pennsylvania, however, in light of the absence of a good faith exception as such. *See supra* note 3. I would therefore take this opportunity to adopt the Commonwealth's formulation to approve the issuance of a second warrant in the limited circumstances as delineated above, as a facet of our independent source doctrine.

Finally, on the matter of the role of credibility assessments in affidavits of probable cause, I join Mr. Justice Castille's concurring opinion.

Justice CASTILLE joins this concurring opinion.

Former Justice NIGRO did not participate in the decision of this case.

Chief Justice CAPPY, Dissenting.

I must respectfully dissent. The Lead Opinion affirms the order of the Superior Court. Yet, it does not do so on the basis put forward by the Commonwealth, namely, that "the second warrant application, which Trooper Allen prepared, saves Appellant's BAC test results from suppression" as Trooper Allen's affidavit constitutes an "independent source". *See* Majority at 247, 892 Pa. at 812. Rather, the Lead Opinion affirms the order of the Superior Court on the basis that the original warrant was constitutionally sound. I am baffled by this reasoning. As noted by the Lead Opinion, the Commonwealth expressly conceded that the first warrant, which was obtained pursuant to Trooper Bryan's affidavit, was faulty. *See* Lead Opinion at 10. The Commonwealth has not raised the issue before this court that the first warrant was valid, and did not do so before the Superior Court. As I believe it is jurisprudentially unsound to turn the resolution of this case on an issue which has been expressly waived by the Commonwealth, I am constrained to dissent.

with this Court's decisions eschewing a generalized good faith exception to the exclusionary rule. *See, e.g., Commonwealth v. Edmunds,* 526 Pa. 374, 410–11, 586 A.2d 887, 905–06 (1991).

Additionally, I feel compelled to respond to the concurring opinion authored by my learned colleague Mr. Justice Saylor. In that concurring opinion, Mr. Justice Saylor suggests adopting a new test which would save the evidence in question from suppression. He believes this test to be a "facet of our independent source doctrine[,]" *id.* at 259, 892 A.2d at 819, even though his test has no requirement that there be, in fact, an independent source. Furthermore, while the good faith of the police figures prominently in this new test, my colleague confidently states that this test does not "conflict with this Court's decisions eschewing a generalized good faith exception to the exclusionary rule." *Commonwealth v. Ruey,* J–99–2005, Saylor C.O. at 4 n. 3 (citing *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 905–06 (1991)).

This new test sanitizes improperly seized evidence via an "independent source" exception even though there is no independent source; it grants a pass (or "do over") to the Commonwealth where the Commonwealth concededly violates the rights of an accused and yet did so in good faith. Both of these concepts are squarely at odds with our case law. *See Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226, 231 (1996) (citation and italics omitted) (requiring that the independent source doctrine may be applied only in those instances where the allegedly independent source is "truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered"); *Edmunds,* 586 A.2d at 905–06 (our Commonwealth's constitution does not recognize a good faith exception to the exclusionary rule). The concurrence's protestations that its test is consistent with our existing case law ring hollow.