COMMONWEALTH of Pennsylvania, Appellee

v.

Brandy Lynn BERKHEIMER, Appellant.

Commonwealth of Pennsylvania, Appellee

v.

Kent Leroy Berkheimer, Appellant.

Superior Court of Pennsylvania.

Argued Sept. 20, 2012.
Filed Nov. 21, 2012.

Matthew M. McClenahan, St. College, for appellants.

Michael Piecuch, District Attorney, Middleburg, for Commonwealth, appellee.

BEFORE: FORD ELLIOTT, P.J.E., MUSMANNO, J., BENDER, J., DONOHUE, J., SHOGAN, J., LAZARUS, J., MUNDY, J., OLSON, J., and WECHT, J.

OPINION BY BENDER, J.

Brandy Lynn Berkheimer and Kent Leroy Berkheimer appeal their respective judgments of sentence following a stipulated bench trial on charges of possession of a controlled substance (marijuana), manufacture of a controlled substance (marijuana), possession of a small amount of marijuana, and possession of drug paraphernalia. *See* 35 P.S. § 780–113(a)(16), (30), (31), (32) (respectively). The Berkheimers contend that all of the evidence on which their convictions rest was garnered during a warrantless search and seizure committed unlawfully by the Pennsylvania

State Police, in the dead of night. The trial court concluded that the search itself was indeed unlawful, but found the evidence seized admissible nonetheless on a supposition of inevitable discovery pursuant to the "independent source" rule. A three-judge panel of this Court affirmed the trial court's ruling with one judge concurring in the result and one judge dissenting on the basis of our Supreme Court's holding in *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996). We granted consideration by the Court *en banc* to determine if in fact the search was unlawful and, if so, whether the evidence is rendered admissible nonetheless by the "independent source" rule or otherwise purged of the taint of illegality. Based on the testimony adduced at the omnibus pretrial hearing, we conclude that the actions of the troopers constituted misconduct within the meaning of the Fourth Amendment and an invasion of the defendants' privacy interest in their home pursuant to Article I, section 8 of the Constitution of this Commonwealth. Moreover, the evidence seized was not subject to discovery by way of an independent source, and therefore is not purged of the taint of illegality. Accordingly, we reverse the Berkheimers' judgments of sentence and order the defendants discharged.

The Berkheimers' misadventure commenced when, on the night of Tuesday, August 25, 2009, Troopers Rodney Shoeman and William Gangloff of the Pennsylvania State Police (PSP) determined to execute a probation detainer on Ryan Lecroy, who had failed to respond to citations imposed following a traffic accident. N.T., Omnibus Hearing, 6/10/10, at 6, 27. Because they were less experienced, Troopers Shoeman and Gangloff enlisted the aid of Troopers Tyson Havens and Scott Davis, two veteran officers of the Criminal Interdiction Unit, Troop F, who that evening were on temporary assignment in the Selinsgrove Barracks of the PSP.[1] *Id.* at 6. Having investigated Lecroy's whereabouts earlier, Trooper Shoeman had obtained a tip from Lecroy's stepfather that Lecroy might be present at 3982 Buckwheat Valley Road in Mount Pleasant Mills, Snyder County. *Id.* at 28. The Buckwheat Valley Road address hosted two residential properties, one of which was a doublewide mobile home with a basement, built on a block foundation and rented by the Berkheimers. *Id.* at 7, 50.

The four troopers reached the Berkheimers' home at 11:30 p.m. and noticed as they approached the house that the rooms were dark and the residents appeared to be asleep. *Id.* at 7, 9. Although the troopers had no particular knowledge of the reliability of the tip concerning Lecroy's whereabouts,[2] Trooper Havens determined that an enquiry of the home's occupants was "[a]bsolutely" appropriate and instructed Trooper Gangloff to knock. In a process that lasted "maybe two seconds, three seconds[,]" Gangloff banged on the door, pushing it open, allowing the smell of

---

1. Trooper Havens testified that, due to the specialized nature of their work, he and Trooper Davis did not work from a single barracks, but travelled between multiple sites in response to the needs of numerous different locales. N.T., Preliminary Hearing, 11/13/09, at 16.

2. Troopers Havens and Gangloff, who testified at the omnibus hearing, could offer no information to substantiate the reliability of the tip. Trooper Gangloff related only the information provided by Trooper Shoeman, while the more-experienced Trooper Havens, observed at the preliminary hearing, "I don't know whether the information was reliable or wasn't." N.T. Preliminary Hearing, 11/13/09, at 16. At the omnibus hearing, he reaffirmed his earlier statement, noting "I knew only what I was told by those two troopers." N.T., Omnibus Hearing, 6/10/10, at 21.

burned marijuana to drift outside, and Trooper Havens entered.[3] *Id.* at 23–24. As Trooper Havens entered, he shined his flashlight into the room and could see Brandy Lynn Berkheimer and her sister, Natasha Lightner, lying asleep on separate sofas.[4] *Id.* at 8. As Lightner awoke, Trooper Havens shined his flashlight on his badge and announced himself as a member of the PSP. *Id.* Lightner then awoke Mrs. Berkheimer who, concerned about the possibility that Lecroy would venture to the home in search of her sister, reported that she was initially terrified. *Id.* at 34–35. Havens then announced his purpose and explained that he had smelled marijuana and was intent on securing the house while he obtained a search warrant. *Id.* at 9, 10–11. Trooper Havens then asked the women if anyone else was present, to which Lightner replied that Mr. Berkheimer was in the bedroom. *Id.* at 9. However, as she arose from the sofa and walked toward the hallway to get him, Havens stopped her and told her to wait in the living room while he went to the bedroom on his own. *Id.* at 10.

Upon reaching the Berkheimers' bedroom, Trooper Havens entered to find Kent Berkheimer standing by the side of the bed and the Berkheimers' daughter, then four years of age, asleep in the bed. *Id.* In the subsequent Affidavit of Probable Cause, Havens averred that he also saw "several glass marijuana pipes, a plastic bag of marijuana, a pill bottle containing marijuana, several rounds of pistol ammunition, along with a book on growing marijuana[,]" all in plain view.[5] Affidavit of Probable Cause, 8/22/09, at 4. Trooper Havens then escorted Mr. Berkheimer to the living room, where he explained that although the three were not under arrest, they also were not free to leave, as he was going to apply for a search warrant to ensure further access to the house. N.T., Omnibus Hearing, 6/10/10, at 10–11. He also asked if there were any firearms in the house, to which Mr. Berkheimer responded that there were two pistols under the mattress in the bedroom from which he had just exited. *Id.* at 11. Trooper Havens then retrieved the pistols and left Troopers Shoeman and Gangloff to superintend Lightner and the Berkheimers while he and Trooper Davis went to the residence next door, still in search of Lecroy. *Id.* At the omnibus hearing, Havens testified that "essentially, the same thing happened [there], only in [that] case, Trooper Davis observed marijuana in plain view." *Id.* at 12. The troopers then determined to search both houses and Havens directed that the residents of the Berkheimer residence, including the couple's four-year-old and a pregnant Mrs. Berkheimer, *id.* at 22, be removed from the residence and confined with the neighbors while he and Trooper Davis went for the warrants. *Id.* at 11–12. Troopers Shoeman and Gangloff remained behind to

---

**3.** Brandy Lynn Berkheimer testified that she was certain that the door was closed and locked. N.T., Omnibus Hearing, 6/10/10, at 45–46. She also acknowledged, however, that for some reason of which she was not aware, the strike plate had been covered with white duct tape such that the catch for the striker had been reduced to an indentation in the tape. *Id.* at 49–50. Following this incident, Mrs. Berkheimer observed that the tape was torn. *Id.* at 40.

**4.** Lightner was married to Ryan Lecroy. She had sought sanctuary in the Berkheimer home due to Lecroy's domestic abuse.

**5.** The record does not explain whether Trooper Havens turned on a light in the room or whether he relied merely on the beam of his flashlight to view the paraphernalia, although in his testimony, he claimed that the nature of the items was "immediately apparent." N.T., Omnibus Hearing, 6/10/10, at 10.

oversee the assembled "suspects" until Troopers Havens and Davis returned with the warrants "[a] few hours later." *Id.* at 12.[6, 7]

Now armed with search warrants, Troopers Havens and Davis returned in what had become the wee hours of the morning. While Troopers Shoeman and Gangloff held the Berkheimers and their neighbors in the neighbors' home, Troopers Havens and Davis searched the Berkheimer home. With the aid of "four or five" additional members of the PSP vice unit, they searched the home thoroughly, and found in the basement a "2x4" wooden box lined with aluminum foil, pots that showed evidence of past plant growth in the form of stems that were cut but still rooted, grow lights, a timer, and additional potting soil. *Id.* at 12, 15–16. They also recovered the contraband seen in the Berkheimers' bedroom as well as an additional three small bags of marijuana and a digital scale in Mrs. Berkheimer's car, which the troopers entered by "jimm[ying]" the door. *Id.* at 47. Nevertheless, the troopers found no live cannabis plants and did not test the stems in the pots. *Id.* at 25. The sum total of marijuana seized during the raid amounted to less than 30 grams, constituting a "small amount" under the Controlled Substances Act. *See* 35 P.S. § 780–113(a)(31).[8]

Following the Berkheimers' arrest, their counsel sought suppression of all evidence seized during the nighttime raid, as well as admissions they had made of having smoked marijuana. Following the omnibus hearing, the trial court recognized that the troopers' search of the residence was unlawful, notwithstanding the belated issuance of a search warrant, as although the troopers' observations suggested probable cause to believe that marijuana was being used inside the residence, the totality of the circumstances failed to establish any exigency beyond that created by the officers themselves. Trial Court Opinion, 7/2/10, at 11 ("Trooper Havens justified his entry into the residence and detention of the occupants by his experience that in drug cases evidence can easily be destroyed, and that drug users are not necessarily asleep at 11:30 in the evening. He was concerned as well about officer safety since weapons are frequently a feature in drug cases. He also said he wanted to apprehend [Lecroy] if he was in the residence. The problem with Trooper Havens['] rationale is that according to his narration, the exigent circumstances were all of the police's own making."). The court denied suppression, however, on the basis that because the smell of marijuana the troopers detected provided probable cause for the issuance of a warrant, the evidence would have been discovered inevitably and therefore is not subject to suppression. *Id.* (citing *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d

---

6. Significantly, Trooper Gangloff who, along with Trooper Shoeman, had recruited Troopers Havens and Davis to go in search of Lecroy, offered no cogent rationale to establish the necessity of this nighttime raid. When queried on cross-examination, "[w]hy didn't you try to serve the warrant during the day time?[,]" Trooper Gangloff responded only, "I believe we were working a p.m. shift." *Id.* at 21. When queried further, "[w]hy didn't you have other troopers serve it during the day when people would be awake?[,]" he merely deferred to Trooper Shoeman. *See id.* at 29 ("I can't speak for Trooper Shoeman on that one.").

7. At no time during this interaction did the troopers provide the Berkheimers with *Miranda* warnings. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

8. Violation of this section constitutes an ungraded misdemeanor, the penalty for which is a $500 fine or thirty days in jail. *See* 35 P.S. § 780–113(g).

377 (1984); *Commonwealth v. Dean*, 940 A.2d 514, 523 n. 3 (Pa.Super.2008)).

At a stipulated bench trial, the court found the Berkheimers guilty as charged and sentenced each to pay a fine of $1000, one month to twenty-three months' jail time with immediate parole upon completion of the one-month minimum, and a concurrent sentence of 37 months' probation. On appeal, a panel of this Court agreed with the trial court's rationale and affirmed the judgment of sentence. We granted reconsideration *en banc* to determine the extent to which the evidence in question was subject to inevitable discovery under the independent source rule and therefore properly admitted. On reargument, the Berkheimers have framed the question for our consideration as follows:

> [Whether] [t]he Trial Court committed an error of law by holding that the independent source doctrine is applicable to a situation where a police team a) illegally obtained evidence through a warrantless, nighttime, non-peaceful entry into a private home in the absence of exigent circumstances, and b) this police team is the very same police team claiming to have legally obtained sufficient evidence to form the basis of a search warrant, through an independent source, prior to conducting a warrantless home invasion[?]

Substituted Brief on Reargument of Appellants at 4.

■ Our analysis of this question begins with the presumption that "[w]here a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible." *Commonwealth v. Ruey*, 586 Pa. 230, 892 A.2d 802, 807 (2006) (Opinion Announcing the Judgment of the Court) (quoting *Commonwealth v. DeWitt*, 530 Pa. 299, 608 A.2d 1030, 1031 (1992)). If the trial court denies the motion, we must determine "whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error." *Commonwealth v. McClease*, 750 A.2d 320, 323 (Pa.Super.2000). In so doing, we may consider "only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Commonwealth v. Maxon*, 798 A.2d 761, 765 (Pa.Super.2002). "Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts." *McClease*, 750 A.2d at 323–24.

■ In support of their suppression claim, the Berkheimers contend that the entry of the state police into their home without a warrant violated their right to privacy guaranteed by the Constitution of this Commonwealth. The Berkheimers argue that the resulting aura of illegality is not susceptible to dissipation through application of the "inevitable discovery" exception to the exclusionary rule recognized in the decisions of the United States Supreme Court, as that doctrine has been supplemented in Pennsylvania by a strong "independent source" requirement that cannot be satisfied on the facts of this case. Substituted Brief on Reargument of Appellants at 10 ("The Trial Court erroneously applied the independent source doctrine articulated in *Nix v. Williams*, 467 U.S. 431, 444 [104 S.Ct. 2501, 81 L.Ed.2d 377] (1984), although this rule had been rendered inapplicable to the case at bar by the Pennsylvania Supreme Court's interpretation of Article I, Section 8 of the Pennsylvania Constitution in *Commonwealth v. Mason* [535 Pa. 560, 637 A.2d 251 (1993)] and its progeny *Commonwealth v. Melendez*, 535 Pa. 560, 637 A.2d

251 (1993) and 544 Pa. 323, 676 A.2d 226 (1996).").  The Commonwealth, by contrast, appears to argue that the four state troopers' entry into the Berkheimer's' home did not constitute an "unconstitutional invasion of privacy," ostensibly distinguishing the Berkheimer's' claim from factually similar scenarios in *Mason* and *Melendez* and ostensibly obviating the protection of the independent source rule. Brief for Appellee at 7 ("The absence of the forcible entry and violent shattering of the door is what distinguishes this case from *Mason*.  In the absence of an unconstitutional invasion of privacy, the inevitable discovery rule applies.").[9]  It also concedes, however, that the troopers conducted their warrantless entry in the absence of exigent circumstances, Brief for Appellee at 6, which, notwithstanding the existence of probable cause, renders the resulting search and seizure unlawful. *See Commonwealth v. Roland*, 535 Pa. 595, 637 A.2d 269, 270 (1994) ("Absent probable cause and exigent circumstances, the entry of a home without a warrant is prohibited by the Fourth Amendment.").

■■■■  The parties' respective arguments counsel our analysis of the rights and privileges inherent in Article I, Section 8 of the Constitution of Pennsylvania and the concomitant protections extended by the exclusionary rule in Pennsylvania law as distinct from those of the Fourth Amendment and the more limited guarantees provided in federal jurisprudence. Notwithstanding the significance of distinctions in the rights and protections extended by the two documents, both recognize the fundamental sanctity of the home as a sanctuary into which police intrusion of the form on display in this case must be constrained with extraordinary vigilance. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (quoting *United States v. U.S. District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)).  That constitutional imperative, which both federal and state jurisprudence embrace to its core, has garnered the defense of generations of jurists whose injunctions against police excess ring no less resolute today than when first consigned to paper.  As admonished in 1948 by the venerable Justice and Nuremburg prosecutor, Robert H. Jackson:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.  Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.  Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing.  The right of officers to thrust themselves into a home is also a

---

**9.** The Commonwealth augmented its position at oral argument, asserting that our Supreme Court's recent decision in *Commonwealth v. Henderson*, —— Pa. ——, 47 A.3d 797 (2012), effectively overrules its prior holding in *Me-* *lendez*.  As we shall discuss, *supra*, the Supreme Court did not purport to overrule application of *Melendez* under all circumstances, but instead limited its application to cases involving police misconduct.

grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Johnson v. U.S.*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). "It is not surprising, therefore, that the [United States Supreme] Court has recognized, as 'a basic principle of Fourth Amendment law[,] that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Welsh*, 466 U.S. at 748, 104 S.Ct. 2091 (quoting *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). *See also Commonwealth v. Roland*, 535 Pa. 595, 637 A.2d 269, 270 (1994) (quoting *Arizona v. Hicks*, 480 U.S. 321, 327, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)) ("In a private home, 'searches and seizures without a warrant are presumptively unreasonable....'").

■ That presumption is buttressed where, as here, the search at issue is conducted in the dark of night. As observed by Mr. Justice Harlan, "[I]t is difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home ..." *Jones v. United States*, 357 U.S. 493, 498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). Indeed, "the fact that an entry is made at night raises particular concern over its reasonableness ... and may elevate the degree of probable cause required, both as implicating the suspect, and as showing that he is in the place

entered." *Commonwealth v. Williams*, 483 Pa. 293, 396 A.2d 1177, 1180 (1979) (citing *Jones, supra.*). So palpable is that concern in this Commonwealth that our Supreme Court has circumscribed even the issuance of warrants for probable cause, mandating that "(n)o search warrant shall authorize a nighttime search unless the affidavits show reasonable cause for such nighttime search." Pa.R.Crim.P. 203(E). Clarifying the extent to which a magistrate may lawfully issue such warrants, this Court has expressly distinguished the showing of probable cause necessary for the issuance of daytime warrants from those to be served at night:

> The Rule is clear that probable cause is required for the issuance of a search warrant authorizing a daytime or nighttime search. However, due to the greater intrusion upon individual privacy occasioned by a nighttime search, some greater justification than that required for a daytime search must be shown. *See* Pa.R.Crim.P. [203(E) and Comment]. *Put simply, the affidavit for a warrant authorizing a nighttime search must show both probable cause and some reason why the search cannot wait until morning.*

*Commonwealth v. Baldwin*, 253 Pa.Super. 1, 384 A.2d 945, 948 (1978) (emphasis added). *Accord Commonwealth v. Camperson*, 437 Pa.Super. 355, 650 A.2d 65, 70 (1994) (noting that the Rule of Criminal Procedure governing issuance of warrants for nighttime searches "requires a showing that the search cannot wait until morning").[10]

---

**10.** As we shall discuss, *supra*, the Affidavit of Probable Cause that Trooper Havens prepared to support the issuance of the warrant included substantial discussion of his observations during his unlawful entry of the Berkheimers' home. Consequently, the warrant was tainted. Nevertheless, even had the affidavit averred only lawful observations, the warrant would have remained unlawful based on the affidavit's failure to establish grounds for execution of a search at night. Trooper Havens averred the need for nighttime service of the warrant initially "due to the fact that the Berkheimer's [sic] and Lightner [sic] are currently being detained pending the outcome of said search warrant." Affidavit of Proba-

In this case, the fact that the troopers did not wait until morning, entering the Berkheimers' home even before they contemplated applying for a warrant, is not in itself dispositive of the parties' arguments, but does inform our evaluation of the legality of police conduct. Under strikingly similar circumstances, our Supreme Court found the warrantless entry of a defendant's home manifestly unlawful, notwithstanding undisputed marijuana use and underage drinking in the residence. *See Roland*, 637 A.2d at 271–72. In *Roland*, the police acted on the tip of an informant who had departed the home in the last hour and reported that he had been assaulted at a party there. *Id.* at 270. When, at 11:30 p.m., the arresting officer arrived at the front door and the defendant answered, the officer observed teenagers in the hallway attempting to hide cans of beer. *See id.* The police then entered, ostensibly to secure the home and prevent the destruction of evidence, the possibility of which they asserted as exigent circumstances to justify a warrantless search. *See id.* In response to the defendant's motion to suppress the evidence as the product of an unreasonable search, the trial court denied suppression and this Court affirmed, on the conclusion that the police had acted in response to exigent

circumstances. *See id.* Our Supreme Court reversed, however, emphasizing the minor nature of the offenses at issue and the execution of the raid at night among factors that negated the Commonwealth's assertion of exigency. *See id.* at 271–72. The Court held accordingly that police entry of the home, undertaken late at night based on underage drinking, was manifestly unlawful. *See id.*

Distinctions in circumstances between those at issue in *Roland* and those found here inure only to the Commonwealth's detriment. Both cases arose out of the warrantless entry of a private home, late at night, on allegations of relatively minor infractions of the law. In this case, however, police reported to the Berkheimers' home with no suspicion of any illegality within and only a speculative tip concerning the whereabouts of a third party wanted for failure to appear in response to traffic citations. Upon arriving at the front door, they formulated probable cause in what Trooper Havens described as less than "maybe two seconds, three seconds[,]" that elapsed between Trooper Gangloff's pounding at the front door to Havens' entry of the house. Although we find those circumstances insufficient to justify entry of the house, we acknowledge the trial court's acceptance of Trooper Ha-

---

ble Cause, 8/26/09, at 1. After the document had been printed, Trooper Havens amended it to include as an additional reason, handwritten at the end of the affidavit, "to insure that the evidence contained at/in said residence is not destroyed pending search warrant. [sic] application." *Id.*

Neither of these bases offer even colorable grounds for the magistrate's issuance of the warrant as both circumstances were spawned by police conduct. If "police may not create their own exigencies, which they then use as justification for exclusion from normal warrant requirements[,]" *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226, 231 (1996), they may not rely on those same circumstances to justify issuance of a warrant, espe-

cially one to be served in the dead of night. Moreover, the circumstances of the detention obviated the need for a nighttime warrant as, given that the home had been secured and the residents removed, there remained no possibility that they might destroy evidence.

Although our Courts have not designated the limitation imposed by Rule 203(E) as one of constitutional dimension, thereby compelling suppression of evidence where the warrant is wrongfully issued, *see Camperson*, 650 A.2d at 71, the Rule's codification of the enhancement of probable cause for the issuance of a warrant to be served at night offers a cogent indication of the disfavor in which our Supreme Court holds the manner of nighttime intrusion at issue in this case.

vens' testimony that he smelled marijuana as the door drifted open. *See McClease,* 750 A.2d at 323–24. The scope of our review is defined accordingly. *See id.* Yet, as our Supreme Court's analysis in *Roland* demonstrates, the taint of illegality is no less manifest. *See Roland,* 637 A.2d at 271 ("Underage drinking is not a grave crime of violence, such as might have justified a warrantless entry.").

▮ The Commonwealth attempts, nevertheless, to excuse the evident illegality of the search the troopers' conducted by invoking the inevitable discovery exception to the exclusionary rule. We find this use of inevitable discovery inconsistent with our Supreme Court's jurisprudence and violative of the right to privacy espoused in Article I, Section 8 of Pennsylvania's Constitution. Article I, Section 8 provides as follows

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. I, § 8.[11] In interpreting this provision, our Supreme Court has held expressly that "Article I, Section 8 . . . is meant to embody a strong notion of privacy, carefully safeguarded in this Common-

wealth for the past two centuries." *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 897 (1991) (recognizing that the current text of Article I, Section 8 has remained substantially unchanged since 1776, and establishes "that the paramount concern for privacy first adopted as part of our organic law . . . continues to enjoy the mandate of the people of this Commonwealth").[12] Thus, the Court has recognized as well that "the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the 4th Amendment. . . ." *Id.*

> The United States Supreme Court [has] made clear that, in its view, the *sole purpose* for the exclusionary rule under the 4th Amendment was to deter police misconduct. . . . The [Court has] also made clear that, under the Federal Constitution, the exclusionary rule operated as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."

*Id.* (quoting *United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). By contrast, the analogous rule in Pennsylvania "has consistently served to bolster the twin aims of Article I, Section 8; to-wit, the safeguarding of privacy and the fundamental requirement that warrants shall be issued upon proba-

---

**11.** The Fourth Amendment uses similar language, as follows, to define federal protection against unreasonable search and seizure:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

**12.** As our Supreme Court explicated in *Commonwealth v. Edmunds,* the Fourth Amendment was preceded by Article I, Section 8, and its text is derivative of it. *See* 526 Pa. 374, 586 A.2d 887, 896–97 (1991). However, notwithstanding the textual similarity of the two provisions, our Supreme Court has offered a more expansive interpretation of Article I, Section 8 that extends additional rights and provides concomitant protections, as we shall discuss, *supra.*

ble cause." *Commonwealth v. Mason*, 535 Pa. 560, 637 A.2d 251, 256 (1993) (quoting *Edmunds*, 586 A.2d at 899). Indeed, our Supreme Court has been adamant in linking a constitutionally guaranteed right to privacy with the need for probable cause embodied in the warrant requirement of Article I, Section 8:

> The linch-pin that has been developed to determine whether it is appropriate to issue a search warrant is the test of probable cause. *It is designed to protect us from unwarranted and even vindictive incursions upon our privacy.* It insulates from dictatorial and tyrannical rule by the state, and preserves the concept of democracy that assures the freedom of its citizens. *This concept is second to none in its importance in delineating the dignity of the individual living in a free society.*

*Edmunds*, 526 Pa. 374, 586 A.2d 887, 899 (quoting *Commonwealth v. Miller*, 513 Pa. 118, 518 A.2d 1187, 1191–92 (1986)) (emphasis added). Thus, unlike the exclusionary rule in federal jurisprudence, exclusion of evidence in Pennsylvania does guarantee the substantive rights of our citizens, including the right not to be disturbed in their homes *prior to* issuance of a warrant upon a good showing of probable cause. *See id.*

These guarantees and the role of the exclusionary rule in effecting them as a guarantee of substantive rights, delimits the inevitable discovery exception as a remedy for violations of the warrant requirement under Article I, Section 8. The resulting limitation is significantly more restrictive than its counterpart under federal law. In view of the divergent purpose of Article I, Section 8, and the distinct protections conferred by our state constitution, our circumspection in application of the inevitable discovery rule is imperative lest the privacy right enshrined there be swallowed whole by an exception conceived without heed of its existence. *See id.* at 895 ("Depending upon the particular issue presented, an examination of related federal precedent may be useful as part of the state constitutional analysis, not as binding authority, but as one form of guidance. However, it is essential that courts in Pennsylvania undertake an independent analysis under the Pennsylvania Constitution.").

The United States Supreme Court presaged the adoption of the inevitable discovery exception to the exclusionary rule with specific reference to the taint of illegality created by police misconduct, against which the Fourth Amendment stands uncontestable. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Thus, in Wong Sun, the Court defined the basis for an exception to the exclusionary rule if evidence obtained through police misconduct could be sufficiently purged of the resulting taint:

> We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'

*Id.* at 487–488, 83 S.Ct. 407 (citation omitted). In subsequent cases, the Court recognized the exception by name, and acknowledged its derivation and application as a measure of police misconduct:

> It is clear that the cases implementing the exclusionary rule "begin with the premise that the challenged evidence is in some sense the product of illegal gov-

ernmental activity." *United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 1250, 63 L.Ed.2d 537 (1980) (emphasis added). Of course, this does not end the inquiry. If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received.

*Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

On similar rationale, the Court has also analyzed distinctions between the "inevitable discovery" exception it adopted and the "independent source" rule. The Court's discussion is most instructive:

> This Court has accepted the argument that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes. On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.
>
> By contrast, the derivative evidence analysis ensures that the prosecution is not put in a worse position simply because of some earlier police error or misconduct. The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. That doctrine, although closely related to the inevitable discovery doctrine, does not apply here; Williams' statements to Leaming indeed led police to the child's body, but that is not the whole story. The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a

crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.[4] When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation. There is a functional similarity between these two doctrines in that exclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place. Thus, while the independent source exception would not justify admission of evidence in this case, its rationale is wholly consistent with and justifies our adoption of the ultimate or inevitable discovery exception to the exclusionary rule.

> 4. The ultimate or inevitable discovery exception to the exclusionary rule is closely related in purpose to the harmless-error rule of *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). The harmless-constitutional-error rule "serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct.

*Id.* at 443–444, 104 S.Ct. 2501 (internal citations omitted).

Following its analysis in *Nix,* the Supreme Court clarified its holding in *Murray v. United States,* distinguishing—and then linking—inevitable discovery and the independent source rule:

> As the First Circuit has observed, "[i]n the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an in-

dependent source." *United States v. Silvestri*, 787 F.2d 736, 739 (1986). We recently assumed this application of the independent source doctrine (in the Sixth Amendment context) in *Nix v. Williams, supra*. There incriminating statements obtained in violation of the defendant's right to counsel had led the police to the victim's body. The body had not in fact been found through an independent source as well, and so the independent source doctrine was not it-self applicable. We held, however, that evidence concerning the body was none-theless admissible because a search had been under way which would have dis-covered the body, had it not been called off because of the discovery produced by the unlawfully obtained statements. *Id.*, 467 U.S. at 448–450, 104 S.Ct. at 2511–12. This "inevitable discovery" doctrine obviously assumes the validity of the independent source doctrine as applied to evidence initially acquired unlawfully. It would make no sense to admit the evidence because the independent search, had it not been aborted, would have found the body, but to exclude the evidence if the search had continued and had in fact found the body. The inevit-able discovery doctrine, with its distinct requirements, is in reality an extrapola-tion from the independent source doc-trine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.

*Murray*, 487 U.S. 533, 538–539, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). The Court then distilled its analysis, focusing on the practical impact the inevitable discovery exception had on admissibility of evidence seized on a search warrant after police had first entered a location where the evidence was seized. *See id.* The high Court for-mulated its inquiry as follows, in recogni-tion that evidence not otherwise available through an independent source could not be considered in the issuance of a warrant and *would not provide grounds for appli-cation of the inevitable discovery excep-tion*:

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. *This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magis-trate and affected his decision to issue the warrant.*

*Id.* at 542, 108 S.Ct. 2529 (emphasis add-ed). Finding the record insufficient to satisfy these concerns, the Court then re-manded the case with direction, requiring a determination of whether the agents would have sought the warrant based on information they obtained prior to their original entry. *See id.* at 543–44, 108 S.Ct. 2529. Notwithstanding the remand, how-ever, the Court's holding in *Murray* makes clear that even under the limited protec-tion of the Fourth Amendment, *the inde-pendent source rule precludes issuance of a search warrant if the law enforcement officers premised their application for the warrant, even in part, on information they obtained during an unlawful entry of the premises to be searched. See id.*

Our Supreme Court adopted and applied *Murray*'s holding in *Commonwealth v. Brundidge*, 533 Pa. 167, 620 A.2d 1115 (1993), but soon modified its application of the inevitable discovery rule expressly in recognition of Article I, Section 8. *See Mason*, 637 A.2d at 254. In *Mason*, the Court confronted a scenario that presented inadequate grounds for suppression in view of the requisites for inevitable discov-

ery as developed in *Nix* and *Murray*. In that case, local police had conducted undercover surveillance of the defendant's apartment, using an unwitting third party to make a controlled buy of illegal drugs using official funds provided by the surveilling officer. *See id.* at 252. After the purchaser exited the apartment, police arrested him and used the information he provided coupled with their own observations during surveillance, to apply for a search warrant. *See id.* While the application for the warrant was pending, an officer at the scene became concerned that the defendant would receive word of the arrest and would destroy whatever evidence she had in the apartment, rendering the application for the warrant essentially moot. *See id.* at 252–53. Accordingly, he approached the door of the apartment with other officers, intending to pose as a maintenance man for the apartment complex. *See id.* at 253. After knocking for approximately two minutes and receiving no response, the officers forced open the door with a battering ram and raided the apartment, discovering cocaine and marijuana as well as drug sales paraphernalia and evidence that drugs had been flushed down the toilet. *See id.* During the course of the raid the warrant arrived, ostensibly legitimizing the seizure of the contraband, if not the officers' actions in entering the apartment. *See id.*

In response to the defendant's motion to suppress the evidence, the Commonwealth argued first that exigent circumstances had compelled the officers' entry of the apartment, as in the absence of intervention, the defendant might have destroyed evidence had she learned of the police presence outside, as the surveilling officers feared. *See id.* In the alternative, the Commonwealth asserted that under the inevitable discovery exception adopted in *Brundidge*, probable cause had been established through independent sources (information obtained during the prior surveillance and arrest), allowing the admission of the evidence notwithstanding the asserted illegality of the pre-warrant raid. *See id.* Initially, our Supreme Court rejected the Commonwealth's assertion of exigent circumstances, as the scenario the officers feared relied on no more than a supposition that, if accepted as a basis for entry of a home, would substantially negate the warrant requirement. *See id.* at 255 n. 2 ("It is always possible that criminals may destroy evidence before the police arrive with a warrant, but unless there is something more than the suspicion that such destruction of evidence may occur, the circumstances are not exigent."). More significantly, however, in its review of inevitable discovery, the Court conceded that if it were to apply that exception as conceived under federal law, the defendant would not be entitled to suppression. *See id.* at 256. Nevertheless, the Court pointedly rejected such a ruling on the basis that even where a warrant was validly issued that would otherwise render the discovery of contraband in the defendant's apartment inevitable on the basis of an independent source, suppression was mandated by the right to privacy enshrined in Article I, Section 8. *See id.* at 256. The Court's exposition of this point marks a clear departure from the federal standard for inevitable discovery:

> If our sole purpose in applying Article I, Section 8 to the facts of this case were to deter police misconduct, we would be constrained to rule in favor of the Commonwealth, for in balancing the interests, it is apparent that society's interest in arresting those guilty of serious crime should not be thwarted where police would inevitably and independently arrive at the same evidence, but for their illegal conduct. However, where our

task is not merely to deter police misconduct, but also to safeguard privacy and the requirement that warrants shall be issued only upon probable cause, our conclusion is different.

*Id.*[13]

Following its holding in *Mason,* which clearly introduced privacy considerations derived from Pennsylvania's constitution as an element of inevitable discovery, our Supreme Court limited the inevitable discovery exception in *Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226 (1996). In *Melendez,* the Court expressly adopted the concurrence of the late Mr. Justice Cappy in *Mason* that counseled extension of the independent source component to require not only a source of evidence independent of the taint of illegality, but also independence of the investigating officers who apply for a warrant from those whose conduct created the initial taint. *See id.* at 231. The Court thus extracted its holding directly from *Mason,* stating that: "[A]pplication of the 'independent source doctrine' is proper only in the very limited circumstances where the 'independent source' is *truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered."* *Id.* (quoting *Mason,* 637 A.2d

at 257–58 (Cappy, J. concurring) (emphasis in original)).

In this case, the record offers no indication that more than one police team participated in the intrusion into the Berkheimers' home. The Commonwealth does not claim that any of the troopers were uninvolved in the illegality at issue; indeed, the evidence adduced at the omnibus hearing established that all of the troopers acted in concert during their preparation for and raid of the Berkheimer home. Consequently, the independent source component in *Melendez,* which further limited the application of the inevitable discovery exception, is of no immediate concern. Nevertheless, at oral argument the Commonwealth persistently characterized as controlling our Supreme Court's recent opinion in *Commonwealth v. Henderson,* —— Pa. ——, 47 A.3d 797 (2012), a case in which the Court modified the holding in *Melendez* by relaxing the independent source requirement. Indeed, the Commonwealth asserted that the new independent source limitation constrained us to affirm the trial court's denial of suppression. In this regard, the Commonwealth has construed *Henderson*'s holding too expansively and disregarded the continuing authority of *Mason.*

In *Henderson,* the Supreme Court premised its holding on circumstances to

---

**13.** Notwithstanding the Court's incorporation of the privacy right to its analysis of inevitable discovery under Article I, Section 8, its discussion suggests that the police misconduct at issue offered significant motivation for its ruling. The following admonition is instructive:

> Where the police battering ram is at the door, without exigent circumstances and without a warrant, it is plain that the violent shattering of the door constitutes an unconstitutional invasion of privacy of which every person in this Commonwealth may complain. The requirement that warrants shall issue only upon probable cause means nothing if police are free to batter

> down the doors of persons who imagine themselves to be secure in their own houses. It is bad enough that some circumstances may require that we approve of bursting through doors at all, but to expand police authority to include battering down doors without a warrant or exigent circumstances, taking the occupants into custody, performing the necessary cursory searches to insure their own safety, and waiting for the arrival of a warrant that they *assume* will be granted, is beyond the bounds of constitutionally acceptable police conduct. *Id.* at 256–257, 586 A.2d 887.

which the Berkheimers' case bears no evident similarity. The scenario in *Henderson* involved application for a search warrant in a rape case in which two teams of officers from the same department shared information while investigating different aspects of the case. *See id.* at 799–800. The investigating detective leading one team obtained a warrant in reliance on illegally obtained information, rendering the warrant defective. *See id.* The detective leading the second team later reviewed the defective affidavit of probable cause and repeated some of the allegations in a subsequent or serial affidavit he prepared in support of his own application for a warrant. *See id.* Asserting that the misfeasance of the detective who obtained the first, unlawful warrant, tainted the efforts of the second detective, the defendant sought suppression of the evidence obtained through use of the second warrant based on a violation of the independent source requirement of *Melendez*. After exploring the parameters of the independent source rule and the guarantees of Article I, Section 8, our Supreme Court determined that in view of the aggravated circumstances of the defendant's crime, insistence on absolute segregation between investigative teams did not serve the interests of justice. *See id.* at 803–04. The Court encapsulated its ruling as follows:

> In the present circumstances, we are unwilling to enforce a "true independence" rule in the absence of police misconduct and on pain of the Commonwealth being forever barred from obtaining non-evanescent evidence connecting Appellant with his crimes. In answer to the specific question presented, we hold that suppression is not required on account of Detective Evans' status as a member of the same police department as Detective Johnson. Rather, in light of the factual circumstances before the Court in both *Melendez* and *Mason,* we deem it appropriate to limit the independent police team requirement to situations in which the rule prevents police from exploiting the fruits of their own willful misconduct. Where such malfeasance is not present, we agree with the Superior Court that the *Murray* standard strikes the appropriate balance between privacy and law enforcement. *See* [*Commonwealth v.*] *Lloyd,* 948 A.2d [875], 881–82 [ (Pa.Super.2008) ]. Ultimately, we believe the "twin aims" of Article I, Section 8— namely, the safeguarding of privacy and enforcement of the probable-cause requirement—may be vindicated best, and most stably, by taking a more conservative approach to the departure this Court has taken from the established Fourth Amendment jurisprudence.

*Henderson,* 47 A.3d 797, 804–805.

■ This language is pragmatic, crafted to recognize the continuing vitality of the holdings in *Mason* and *Melendez* in cases where evidence obtained through police misconduct cannot be effectively sequestered by the more limited constraints imposed by Fourth Amendment jurisprudence culminating in *Murray.* Under such circumstances, our Courts can and should continue to impose the full panoply of protections heretofore created by Pennsylvania jurisprudence, including its rigorous interpretation of the independent source rule. Law enforcement may not act willfully to avail itself of unlawful conduct in the expectation that the more relaxed measure of inevitable discovery espoused in Fourth Amendment jurisprudence will somehow vindicate the right to privacy enshrined in Article I, Section 8. Rather, where misconduct by law enforcement officers is apparent, negating the warrant requirement and violating the constitutional right

to privacy as in *Mason* and *Melendez,* those holdings continue as precedential authority. The right to be free of unreasonable search and seizure and the mandate of probable cause guaranteed by Pennsylvania's constitution, are not served by overzealous police conduct, and our Courts' jurisprudence does not signal any retrenchment of this imperative.

■ By the same token, where, as in *Henderson,* the record establishes a substantially unwitting violation of the warrant requirement, devoid of any cognizable misconduct, application of the inevitable discovery exception, including the appropriate measure of an "independent source," are consigned to the Fourth Amendment standard exemplified by *Murray.* Of course, the extent to which the actions of law enforcement officers constitute misconduct within the Court's contemplation in *Henderson* remains a matter of judicial oversight, the facts in *Mason* and *Melendez* to serve as guideposts. As those cases exemplify, entry of a private home in the absence of a warrant, on the pretext of circumstances that are not demonstrably exigent, poses a substantial invasion of privacy and may constitute police misconduct. The likelihood of such a finding can only be enhanced where, as here, the officers entered in the dark of night on the suggestion of minor infractions, wrenching the occupants from their home and holding them elsewhere for an excessive duration.

Nevertheless, we need not make an express determination that the troopers' raid of the Berkheimers' residence constituted the manner of misconduct contemplated in *Henderson.* This case does not involve collaboration between multiple police officers or investigative teams, one engaged in misconduct that might taint the efforts of others unless rigorously segregated by an "independent police team" requirement.

Instead, it arises from the concerted actions of a single group of officers. Consequently, the extent to which one investigative team acted independently of another such as to implicate the "independent police team" corollary of the independent source rule adopted in *Melendez* is not at issue.

■ This case is similarly distinct from the scenario in *Mason.* Significantly, whereas the Commonwealth persisted in that case in asserting "exigent circumstances" posed by the potential destruction of evidence by the apartment's occupants, the Commonwealth has conceded in this case that the circumstances attending the raid suggest no real exigency. Although in its brief, the Commonwealth attempts to distinguish this case from *Mason,* nonetheless, asserting that the officers in this case did not use a battering ram, rendering the troopers' actions less invasive of the defendants' privacy, its argument fails on both legal and factual grounds. Initially, although the violence inherent in the unwarranted use of a battering ram defined the Supreme Court's repudiation of police conduct in *Mason* and prompted its intervention under the auspices of Article I, Section 8, the Court's holding did not define the right to privacy merely as a prophylactic against violence. In the "work-a-day world" where real people live, a nighttime invasion of a family's solitude and security while everyone in the house is asleep is every bit as violative of the right to privacy as the shattering of a door in the middle of the day. *See Mason,* 637 A.2d at 252 (documenting that the police acted "during the early afternoon hours"). Indeed, viewed through the lens of surrounding circumstances, the invasion perpetrated here is substantially more egregious than the conduct that provoked our Supreme Court's opprobrium in *Mason.* *See* 637 A.2d at 256. In this case, four troopers,

two of whom had achieved significant experience, ventured to the Berkheimers' home on the basis of a tip that purported no particular reliability in search of someone wanted on a probation detainer for failure to respond to traffic citations. The Commonwealth has offered no colorable rationale to explain the troopers' need to conduct such a visit at night, much less bang on the door at 11:30 p.m., when the house lay dark and silent, offering every suggestion that the occupants were deep in slumber. Significantly, the troopers then allowed no opportunity for the occupants to answer, supposing instead that the law would condone their entry because in less than "maybe two seconds, three seconds" between knocking and intruding, N.T., Omnibus Hearing, 6/10/10, at 23–24, they discerned a whiff of marijuana. Upon entering, they effectively commandeered the house, sequestering the residents, including a pregnant Mrs. Berkheimer and the Berkheimers' four-year-old child, and marched them to a neighboring property, where two troopers held them (along with their neighbors) until the warrant arrived "[a] few hours later." *Id.* at 12. When the warrant arrived and an augmented contingent of troopers searched the house more thoroughly, they found less than 30 grams of marijuana. Seldom has this Court encountered conduct by law enforcement officers so abjectly inimical to the guarantees of Article I, Section 8. Were the independent source rule truly at issue in this case, this scenario could only counsel our application of the rigorous safeguards espoused in *Mason* and *Melendez*.[14]

The Commonwealth's argument fails more fundamentally, however, because defects in Trooper Havens' Affidavit of Probable Cause invalidate the subsequent warrant, failing to satisfy even the more attenuated independent source standard of *Murray*. *See* 487 U.S. at 542, 108 S.Ct. 2529 (holding that the independent source rule is not satisfied "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant"). In *Murray*, federal agents entered a warehouse without a warrant after they seized marijuana from two cars the suspects had driven in and out of the warehouse. *See id.* at 535–36, 108 S.Ct. 2529. Inside the warehouse, the agents encountered a significant stash of marijuana, but omitted mention of it in their affidavit of probable cause, ostensibly to avoid tainting the reviewing magistrate. *See id.* Nevertheless, the Supreme Court recognized the infirmity of the resulting search, as the prosecution could not demonstrate that the agents would have sought a warrant had they not first entered the warehouse. *See id.* at 543, 108 S.Ct. 2529. In this case, by contrast, Trooper Havens included in the Affidavit explicit discussion of contraband he had seen after unlawfully entering the Berkheimer residence. Although he also noted having smelled marijuana outside the front door, the emphasis and context of the affidavit's language indicate the trooper's primary reliance upon observations made while inside the dwell-

14. *Henderson's* recognition of *Melendez* as a case emblematic of police misconduct is especially probative of our Supreme Court's measure of the constitutional definition of "willful misconduct." Unlike in *Mason*, the officers in *Melendez* used no significant force to enter the defendant's residence, but instead entered

with her keys and, ostensibly, with her consent. *See Melendez*, 676 A.2d at 231. Thus, contrary to the Commonwealth's suggestion, application of the more restrictive safeguards of Article I, Section 8, does not require a violent entry as had occurred in *Mason*.

ing.[15] Those observations were thus integral to the magistrate's consideration of the warrant application. This circumstance in itself eliminates any possibility that the independent source rule can be satisfied on these facts.

This distinction is, of course, critical. In *Mason*, law enforcement had sought a warrant prior to entering the defendant's home and obtained the warrant based on information gleaned without resort to illegal entry, thus allowing at least the possibility that the Commonwealth could comport with Fourth Amendment jurisprudence delineating the independent source rule. In response, the Court identified Article I, Section 8 as a source of additional rights and protections that could not be met under the aggravated circumstances in that case. By contrast, while the circumstances in this case exceed those in *Mason* when measured by the injury they inflicted to the defendants' right to privacy, they also fall substantially short of demonstrating an independent source as required by *Murray*. Although the search is thus doubly infirm, we need only rely on Fourth Amendment jurisprudence to strike it down. *Quite simply, the record in this case identifies no source whatsoever unsullied by the taint of illegality.* Therefore, the inevitable discovery exception is not satisfied and the evidence on which

the Commonwealth relies was obtained unlawfully.

For the foregoing reasons, we conclude that the trial court erred in denying the defendants' joint motion for suppression. As Mr. Justice Brandeis observed almost a century ago: "If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Edmunds*, 586 A.2d at 906 (quoting *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)). "Although the exclusionary rule may place a duty of thoroughness and care upon police officers and district justices in this Commonwealth, in order to safeguard the rights of citizens under [the Fourth Amendment and] Article I, Section 8, that is a small price to pay, we believe, for a democracy." *Id.* In the absence of the Commonwealth's proffered evidence, obtained by palpably unlawful government action, there is no evidence that these defendants engaged in any act that was itself unlawful. Consequently, they are entitled to a full discharge.

Judgments of Sentence **REVERSED**. Defendants **DISCHARGED**. Jurisdiction **RELINQUISHED**.

---

**15.** While Trooper Havens' reference to his initial detection of the odor of marijuana was limited, Affidavit of Probable Cause, 8/26/09, at 3 ("While standing at the open door, I could smell the moderate odor of marijuana coming from within the residence"), his discussion of his observations inside the house and comments made by the occupants, was considerably more detailed, *see id.* at 4 ("I also observed several glass marijuana pipes, a plastic bag of marijuana, a pill bottle containing marijuana, several rounds of pistol ammunition, along with a book on growing marijuana. Once there, I advised all present that

I was going to make an application for a search warrant of their residence.... Kent Berkheimer then advised that he had two handguns inside his bedroom underneath the mattress/bed that he and his daughter were sleeping on. Both handguns (loaded magazines) were then secured from underneath said mattress. He also related that he either has additional marijuana inside his bedroom, or in his car in the driveway."). Trooper Havens then averred probable cause to search for additional marijuana on the property based specifically "on the presence of the listed book on growing marijuana." *Id.*