**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Michael L. HOWARD, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 7, 2013.

Filed March 19, 2013.

---

vember 8, 1984, here the tanks were not removed until 1999. Therefore, this exception is inapplicable.

Elayne Bryn, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: BENDER, J., LAZARUS, J., and COLVILLE, J.*

OPINION BY BENDER, J.

Michael L. Howard appeals the judgment of sentence of 15 to 30 years' imprisonment imposed following his conviction of Possession of a Controlled Substance, Pos-

* Retired Senior Judge assigned to the Superior Court.

session With Intent to Deliver, Possession of Drug Paraphernalia, Criminal Conspiracy, Possession of a Prohibited Firearm, and Possession of Instruments of Crime. *See* 35 P.S. § 780–113(a)(16), (30), (32); 18 Pa.C.S. §§ 903, 6105(a)(1), 907 (respectively). Howard contends that the trial court erred in denying his motion to suppress evidence seized from his person pursuant to a warrantless arrest, as well as additional evidence seized from his home pursuant to a warrant after police first entered on the assertion of exigent circumstances. Upon review, we find no error in the trial court's rulings given the limitations of Howard's claims. Accordingly, we are constrained to affirm his judgment of sentence.

Howard's conviction arose out of a police investigation of the sale of illegal drugs from a residence at 5820 N. 12th Street in the City Of Philadelphia. The trial court has ably summarized the evidence of record as follows:

> On November 12, 2009, at approximately 7:15 p.m., Police Officer Deidre Still began a surveillance of 5820 North 12th Street in response to numerous complaints about illegal drug activity at that address. At approximately 7:30 p.m., Officer Still observed a black female, later identified as Kathleen Moore, walk up the steps of the property and knock on the front door. Two seconds later, a black male, later identified as defendant, answered. After the two engaged in a brief conversation, Ms. Moore handed defendant an unknown amount of money. In turn, defendant handed Ms. Moore unknown objects, which she placed into her pocket. She then walked northbound on 12th Street and turned eastbound on Nedro Street. Believing that a narcotics transaction had just occurred, Officer Still relayed flash information to her backup officers. Officer McFetch stopped Ms. Moore and

> recovered two blue tinted Ziploc packets containing crack cocaine from her.

> Upon continued surveillance of this residence, Officer Still observed a black male, later identified as Michael Neicesmith, walk up the steps of the property and knock on the front door. Defendant answered the door and engaged in a brief conversation with Mr. Neicesmith. After Mr. Neicesmith handed defendant an unknown amount of money, defendant handed Mr. Neicesmith unknown objects. Mr. Neicesmith placed those objects into his pocket and walked northbound on 12th Street. After observing this second narcotics exchange, Officer Still relayed flash information to her backup officers. Sergeant Luca stopped Mr. Neicesmith and recovered one blue tinted Ziploc bag containing crack cocaine from the ground where Mr. Neicesmith was stopped.

> Officer Still next observed another black male, later identified as Richard Brown, park a four-door compact car in front of the residence. Mr. Brown exited the vehicle, walked up the steps of the property and knocked on the front door. Defendant answered the door and engaged in a brief conversation with Mr. Brown. After Mr. Brown handed defendant an unknown amount of money, defendant then handed Mr. Brown unknown objects. Mr. Brown placed the items into his pocket, returned to the vehicle, and drove southbound on 12th Street. After observing this third narcotics exchange, Officer Still relayed flash information to her backup officers. Officer Melendez stopped Mr. Brown on the 5700 block of 12th Street and recovered from him three blue tinted plastic bags containing crack cocaine.

> Shortly thereafter, Officer Still observed defendant exit the property at 5820 North 12th Street with a black

male, later identified as Michael Thomaston. The two men entered a black Mercury Grand Marquis which proceeded southbound on 12th Street. Officer Still immediately directed Officers McGonigle and Kensey to stop this vehicle. Officers McGonigle and Kensey stopped the vehicle on the 1100 block of Champlost Avenue, approximately two and one-half blocks from defendant's residence. Officer McGonigle approached Mr. Thomaston, who was the driver, and Officer Kensey approached the defendant, who was sitting in the passenger seat. Officer McGonigle arrested Mr. Thomaston and recovered keys to the defendant's residence. Officer Kensey arrested defendant and recovered one blue tinted plastic bag containing crack cocaine and $95 cash from defendant's pockets.

Based on Officer Still's surveillance and defendant's arrest, Sergeant Luca believed that additional narcotics would be found inside defendant's residence. To prevent any potential destruction or removal of this evidence, Sergeant Luca decided to secure the premises while he waited for the approval of a search warrant. When Sergeant Luca knocked on the door and announced his presence, a black female, later identified as Cindy Pringle, answered. When Ms. Pringle realized that police were at the door, she threw three blue tinted packets of crack cocaine behind the door. Police immediately entered the property, arrested Ms. Pringle and recovered the discarded narcotics.

Believing that other individuals might be inside with Ms. Pringle who could compromise police safety, Sergeant Luca and four to five additional police officers from the Narcotics Enforcement Team entered the property and conducted a one-minute cursory search. In conducting this cursory search, police quickly looked into each open room, underneath beds, and inside closets to ensure that no one else was inside the residence. They did not open any dresser drawers or kitchen cabinets. During this cursory search, police did not find anyone else inside the residence. They also did not find any narcotics or weapons during this cursory search. Once they discovered that no one else was inside the residence, police exited the property and secured the front and back of the premises.

At 1:30 a.m., on November 13, 2009, police executed the search warrant for defendant's residence. While executing this search warrant, police recovered 99 blue tinted Ziploc packets of crack cocaine from the kitchen wall and new and unused colored packets on the kitchen table. They also found a .380 caliber semiautomatic firearm with five live rounds under the kitchen sink. Police recovered two business letters listing Anthony Howard and the address of 5820 North 12th Street.

The firearm was submitted to the Firearms Identification Unit, which test fired the gun and determined it to be operable. All of the narcotics retrieved from the buyers, defendant's person and the residence were submitted to the chemistry laboratory for analysis. The two blue tinted Ziploc packets of crack cocaine recovered from Ms. Moore weighed 80 milligrams per packet. The one blue tinted Ziploc packet of crack cocaine recovered from Mr. Neicesmith weighed 87 milligrams. The two blue tinted Ziploc packets of crack cocaine from Mr. Brown weighed 85 milligrams per packet. The one blue Ziploc packet of crack cocaine recovered from the defendant weighed 79 milligrams. The three blue tinted Ziploc packets of crack cocaine from Ms. Pringle weighed 73

milligrams per packet. The 99 packets of cocaine recovered from the kitchen wall totaled 8.611 grams. Due to defendant's prior conviction at CP–51–CR–0328651–1994, he was ineligible to possess a firearm under Section 6105 of the Uniform Firearms Act.

Trial Court Opinion, 4/18/12, at 1–5.

Following a preliminary hearing, the Commonwealth charged Howard with the foregoing offenses by information on March 19, 2010. Subsequently, Howard filed an Omnibus Pre–Trial Motion seeking suppression of the evidence seized from his person incident to arrest, as well as the evidence seized at 5820 N. 12th Street pursuant to a search warrant. Howard contended that both searches violated the Fourth Amendment and that the police entry of 5820 N. 12th Street prior to receipt of the warrant was not supported by exigent circumstances independent of those created by the police themselves when they ventured to the home and knocked on the door.[1] In response to Howard's motion, the trial court convened a suppression hearing, during which the Commonwealth adduced testimony from Officer Still, Officer McGonigle, and Sergeant Luca, each detailing their respective roles and observations in the events preceding Howard's arrest and the entry by police of 5820 N. 12th Street. Sergeant Luca in particular noted that prior to venturing to the home, he had intended to secure the exterior exits and had knocked on the door only to verify that no one remained inside. He noted further that he was surprised when Cindy Pringle answered the door, but found it necessary to enter the house when, as she opened the door, she tried to dispose of the drugs in her hand. Howard also presented evidence, electing to testify on his own behalf, and offering testimony by witness Hugh Vincent Gillard, who attested that he had been in the N. 12th Street residence when the police entered. He asserted that the officers had held him at gunpoint, handcuffed him, ransacked the house, and searched the kitchen drawers and cabinets before taking him to the station. Gillard also averred that the officers had found the gun and the drugs that underlie the charges in this case, but left them there pending an application for a warrant.

On the day after the suppression hearing, the court reconvened and stated Findings of Fact for the record. Among the court's findings were that the police had entered 5820 N. 12th Street only to secure the premises and prevent the destruction of evidence, that they had not observed or recovered contraband during the pre-warrant sweep, and that the evidence in question was legally seized pursuant to a search warrant. At that same proceeding, Howard waived his right to a jury trial following a colloquy with the trial judge, and the court disposed of the case pursuant to the evidence offered at the previous day's suppression hearing. The court found Howard guilty as charged, and ordered a pre-sentence investigation, following which the court convened a hearing on sentencing. After reviewing the Sentencing Guidelines, the court imposed consecutive sentences of five to ten years' incarceration for PWID, conspiracy, and the firearms violation, as well as concurrent sentences on the remaining offenses. Thus, Howard's aggregate sentence amounted to 15 to 30 years in prison.

1. Although Howard filed a Memorandum of Law in support of his request for suppression, he made only cursory mention of the Pennsylvania Constitution and provided no analysis of whether its guarantees against unreasonable search and seizure provided additional protection not otherwise afforded by the Fourth Amendment. Accordingly, the trial court confined its analysis to the bounds of the Fourth Amendment.

Howard has now filed this appeal, raising the following questions for our consideration:

I. Did the trial court err and "abuse its discretion" in the denial of the Omnibus Pre–Trial Motion, suppression motion, because the search of the Defendant was done without a proper and valid search warrant when there were no exigent circumstances to justify the warrantless search?

II. Did this Honorable Court [sic] err and "abuse its discretion" in the denial of ·the Omnibus Pre–Trial Motion, suppression motion, because a warrantless search was conducted of the Defendant's property and no exception to the search warrant requirement existed? [2]

Brief for Appellant at 2. Both of Howard's questions challenge the trial court's rulings on a motion to suppress evidence illegally obtained.

Our analysis of th[ese] question[s] begins with the presumption that "[w]here a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible." *Commonwealth v. Ruey*, 586 Pa. 230, 892 A.2d 802, 807 (2006) (Opinion Announcing the Judgment of the Court) (quoting *Commonwealth v. DeWitt*, 530 Pa. 299, 608 A.2d 1030, 1031 (1992)). If the trial court denies the motion, we must determine "whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error." *Commonwealth v. McClease*, 750 A.2d 320, 323 (Pa.Super.2000). In so doing, we may consider "only the

evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Commonwealth v. Maxon*, 798 A.2d 761, 765 (Pa.Super.2002). "Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts." *McClease*, 750 A.2d at 323–24.

*Commonwealth v. Berkheimer*, 57 A.3d 171, 177 (Pa.Super.2012) (en banc).

In support of his first question, Howard contends that the trial court erred in denying suppression of contraband seized from his person during a search incident to arrest. Brief for Appellant at 12. Howard's argument, however, is limited and offers little guidance for our analysis. After a review of case law delineating the hierarchy of police encounters, Howard recounts occurrences after his departure from 5820 N. 12th Street, but eschews analysis with the summary conclusion that "[a]t the time that the appellant was stopped by the police, he was not engaged in suspicious behavior nor was there evidence that the [sic] Mr. Howard was engaged in criminal behavior." Brief for Appellant at 14. We interpret Howard's challenge as an assertion that whatever observations the police made contemporaneous with their decision to stop him were not sufficient to establish reasonable suspicion. *See id.* at 13 (citing *Commonwealth v. Spencer*, 558 Pa. 50, 735 A.2d 673, 677 (1999)) (reciting the legal threshold for investigative detention). We find no merit in Howard's assertion.

---

**2.** We note Howard's attribution of the denial of suppression to "this Honorable Court." We recognize, however, consistent with his averment in Question # 1, that Howard's question is a challenge to the action of the trial court, on whose rulings this appeal is premised.

We acknowledge that prior to stopping a citizen for investigative purposes, a police officer must possess at least reasonable suspicion of that individual's involvement in illegal activity based on the totality of the circumstances as known to the officer. *See Commonwealth v. Brown,* 606 Pa. 198, 996 A.2d 473, 477 (2010). Nevertheless,

> [r]easonable suspicion is a less stringent standard than probable cause necessary to effectuate a warrantless arrest, and depends on the information possessed by police and its degree of reliability in the totality of the circumstances. In order to justify the seizure, a police officer must be able to point to "specific and articulable facts" leading him to suspect criminal activity is afoot. In assessing the totality of the circumstances, courts must also afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and acknowledge that innocent facts, when considered collectively, may permit the investigative detention.

*Id.* (citations omitted).

In this case, the facts of record readily satisfy the foregoing standard and provide ample grounds for the stop the officers conducted. Officer Still testified that she began surveillance of 5820 N. 12th Street at approximately 7:15 p.m. on the day in question in response to neighborhood complaints of illegal drug activity at that address. N.T., Motion Volume I, 8/8/11, at 6–7. At 7:30 p.m., Officer Still observed the first of three transactions, each of which consisted of a different individual approaching the residence and knocking at the door. *Id.* at 7–9. In each instance, Howard answered the door, conducted a brief conversation with the individual outside, and accepted cash, following which he gave the respective individuals small objects. *Id.* Each individual then stuffed the objects into a pocket and left the scene. *Id.* On each occasion, Officer Still then relayed flash information to officers working as back up within a short distance of the residence, with instructions to stop the respective individuals for questioning. *Id.* at 8–10. When the officers conducted stops and patted the subjects down, they recovered lumps of crack cocaine, each of a size between 75 and 85 milligrams. *Id.* Shortly thereafter, Officer Still observed Howard leave the premises with a companion, later identified as Michael Thomaston, get into a black Mercury Grand Marquis, and drive southbound on 12th Street. *Id.* at 10. Again, Officer Still relayed the information to back-up officers with directions to stop the car based on the conduct she had observed. *Id.* When Officer McGonigle and his partner conducted the stop approximately two and one-half blocks away, they recovered the contraband and cash from Howard's person that Howard later sought to have suppressed. *Id.* at 10–11.

Counsel identifies no authority (and we are aware of none) that prohibits investigating officers from acting on flash information conveyed by fellow officers who have, in the moments preceding their broadcast, observed suspicious conduct reasonably suggestive of illegal activity. Thus, whereas Howard contends the officers who stopped him did not observe indications that illegality was afoot, his argument ignores the fact of Officer Still's observations of three suspicious transactions that Howard conducted on the threshold of his front door. When considered in view of the subsequent arrest of each of the individuals involved in those transactions and their possession of crack in rocks of the same general size following exchanges of cash with Howard, the reasonableness of police action in stopping Howard is more than evident. In short, the totality of the circumstances observed

by the officers investigating occurrences at 5820 N. 12th Street *does* establish reasonable suspicion that moments before he was stopped, Howard had conducted three illegal drug sales. Consequently, Howard's assertion that the officers conducted an unlawful stop, does not provide grounds for suppression of the evidence seized pursuant to the stop and Howard's subsequent arrest. Howard's argument to the contrary does not provide grounds for relief.

■ In support of his second question, Howard asserts that the trial court erred in denying suppression of a significant quantity of crack cocaine, paraphernalia, and a firearm seized from inside the N. 12th Street residence. Brief for Appellant at 14. Although the evidence was seized pursuant to a duly-issued search warrant, Howard argues that the warrant was itself tainted by the entry the police made beforehand purportedly on the basis of exigent circumstances to avoid the destruction of evidence. *Id.* at 16–18. Howard contends that, in fact, the exigency the Commonwealth claims was created by the police, who returned to 5820 N. 12th Street and knocked on the door without reason to believe that anyone even remained in the house. *Id.* at 16–17. Absent their return and Sergeant Luca's knocking at the door, he asserts, the potential for destruction of evidence would have been negligible, and the circumstances would have allowed adequate time for the police to obtain a warrant based on evidence they had seized during Howard's arrest and those of the purchasers. *Id.* at 18. In support of his challenge to the Commonwealth's claim of exigent circumstances, Howard relies primarily on the Fourth Amendment, but also attempts to invoke the protections of Article I, section 8, of the Pennsylvania Constitution, citing our decision in *Commonwealth v. Demshock,* 854 A.2d 553 (Pa.Super.2004).

In *Demshock,* we reaffirmed a measure of exigency that imposes significant limits on the ability of law enforcement officers to enter a private residence on the claim of exigent circumstances as an exception to the warrant requirement when the conduct of the officers themselves creates the exigency. *See id.* at 555–56. Relying on prior jurisprudence by our Supreme Court, we repeated our state's time-honored formula for a review of claimed exigency:

> Among the factors to be considered are: (1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, i.e., whether it was made at night. These factors are to be balanced against one another in determining whether the warrantless intrusion was justified.

*Id.* (quoting *Commonwealth v. Wagner,* 486 Pa. 548, 406 A.2d 1026, 1031 (1979)).

■ Were we to apply Pennsylvania's measure of exigency to the circumstances here, we would agree with Howard that his claim of false exigency poses at least a claim of arguable merit. Unfortunately for Howard, his counsel failed to make any cognizable state constitutional argument in the trial court, choosing instead to premise his entire claim on the Fourth Amendment. *See* Memorandum of Law in Support of the Omnibus Pretrial Motion at 2 (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 454, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). Inasmuch as an appellant

may not raise claims for the first time on appeal, we are constrained to consider Howard's claim only in light of the argument he made-not on the basis of one he could have made. *See Commonwealth v. Baumhammers,* 599 Pa. 1, 960 A.2d 59, 73 (2008) (deeming claims of constitutional magnitude waived based on failure of capital defendant's counsel to have raised them in argument before the trial court). Consequently, we review Howard's claim of false exigency as a function of the Fourth Amendment.

In the recent case of *Kentucky v. King,* —— U.S. ——, 131 S.Ct. 1849, 1862–63, 179 L.Ed.2d 865 (2011), the United States Supreme Court granted certiorari to resolve the question of "[u]nder what circumstances do police impermissibly create an exigency?" *See id.* at 1854. That case, much like this one, arose during a drug investigation. Acting on complaints of illegal drug activity, officers observed a controlled buy outside an apartment complex, and followed one of the suspects onto the property. *See id.* The investigators lost sight of the suspect but heard a door slam at the end of a breezeway, thus signaling the general area to which he had retreated. *See id.* Nevertheless, the officers discovered the doors of two apartments at that location, either of which might have harbored the suspect. *See id.* However, because they smelled the scent of marijuana emanating from behind the door on the left, they elected to approach that apartment. *See id.* In response to their summons as they knocked on the door, the officers heard the telltale sounds of hurried concealment as the occupants rushed to hide their activities and, ostensibly, destroy evidence. *See id.* In response to those sounds, the police burst through the door and searched the apartment, seizing contraband in plain view that was then introduced at the defendant's trial, resulting in his conviction. Significantly, the defendant was not the drug dealer they had followed from the parking lot; subsequent investigation revealed that that suspect was holed up in the apartment on the right and not the apartment the officers had searched. *Id.* at 1855.

On appeal, the Supreme Court of Kentucky ordered the fruits of the search suppressed as the product of police-created exigency spawned by the officers having approached the door to begin with in the absence of sufficiently reliable evidence that the suspect they sought was inside. *See id.* at 1854. On further review, however, the United States Supreme Court differed sharply with the state high court, criticizing the multiple measures of false exigency employed by state and federal appeals courts and substituting a standard of Fourth Amendment exigency that pays extraordinary deference to police investigative tactics. *See id.* at 1858–61. The Court announced this new test as follows:

[W]e conclude that the exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment. This holding provides ample protection for the privacy rights that the Amendment protects.

When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. *Cf. Florida v. Royer,* 460 U.S. 491, 497–498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). ("[H]e may decline to listen to the questions at all and may go on his way"). When the police knock on a door but the occupants choose not to respond or to speak, "the investigation will have reached a conspicuously low point," and the occupants "will have the kind of warning that even the most

elaborate security system cannot provide." [U.S. v.] Chambers, 395 F.3d [563], 577 [ (6th Cir.(Tenn.) 2005) ](Sutton, J., dissenting). And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.

Occupants who choose not to stand on their constitutional rights but instead elect to attempt to destroy evidence have only themselves to blame for the warrantless exigent-circumstances search that may ensue.

King, 131 S.Ct. at 1862. For Fourth Amendment purposes, this standard appears to hold that police create their own exigency only where they enter the suspect premises without warning, thus prompting destruction of evidence, or when they threaten to enter unless the occupants admit them.[3] Although such attenuated protection is radically divergent from the heightened protections our state Courts have guaranteed under Article I, Section 8 of the Constitution of Pennsylvania, see Demshock, 854 A.2d at 555–56, our state standard does not direct our disposition where the only grounds presented for review are limited to the Fourth Amendment.

In its curtailment of Fourth Amendment protections, the standard in King is simple and easily applied. On the facts of this case, it offers no grounds for the relief Howard seeks. Paraphrasing Justice Alito, who wrote for the Majority, Sergeant Luca, in knocking at the door, did "no more than any private citizen might do." King, 131 S.Ct. at 1862. For her part, Ms. Pringle may have chosen not to respond to the officers' knock, or had she chosen to do so, need not have spoken to the police and may have elected to close the door. See id. Because she chose "not to stand on [her] constitutional rights but instead elect[ed] to attempt to destroy evidence [she had] only [herself] to blame for the warrantless exigent-circumstances search that [did] ensue." Id. Thus, as the police did not act in violation of the Fourth Amendment in entering the house in response to the exigency they perceived, their subsequent discoveries pursuant to a duly-issued search warrant cannot be deemed tainted. Thus, the evidence seized at 5820 N. 12th Street is not subject to suppression under the Fourth Amendment, and the trial court did not err in so ruling.

For the foregoing reasons, we affirm Howard's judgment of sentence.

Judgment of sentence AFFIRMED.

Judge COLVILLE files a concurring opinion.

CONCURRING OPINION BY COLVILLE, J.:

I agree that Appellant is not entitled to relief; however, I would address his appellate issues as follows.

3. This interpretation is borne out by the Court's reflection on circumstances that might have violated the Fourth Amendment, and its companion conclusion that the circumstances here do not cross that threshold. The following discussion is illustrative:

In this case, we see no evidence that the officers either violated the Fourth Amendment or threatened to do so prior to the point when they entered the apartment. Officer Cobb testified without contradiction that the officers "banged on the door as loud as [they] could" and announced either " 'Police, police, police' " or " 'This is the police.' " This conduct was entirely consistent with the Fourth Amendment, and we are aware of no other evidence that might show that the officers either violated the Fourth Amendment or threatened to do so (for example, by announcing that they would break down the door if the occupants did not open the door voluntarily). King, 131 S.Ct. at 1863 (internal citation omitted).

Appellant's first issue is a challenge to the warrantless search of his person. That search was conducted pursuant to his arrest. A search incident to a lawful arrest is a specifically established and well-delineated exception to the Fourth Amendment prohibition against warrantless searches. *In the Interest of O.A.,* 552 Pa. 666, 717 A.2d 490, 495 (1998). Appellant does not challenge the legality of the arrest. Accordingly, Appellant's first issue is without merit.

Appellant's second issue is a challenge to the search of his property. That search was conducted pursuant to a search warrant. Appellant does not challenge the legality of the search warrant. Accordingly, this issue is also without merit.

For these reasons, I would affirm the judgment of sentence. Thus, I concur.